UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

EASTON STEVENS,                                     :
Individually and on Behalf of All                   :      Judge I. Leo Glasser
Other Persons Similarly Situated,                   :
                                                    :      Magistrate Judge Viktor V. Pohorelsky
                              Plaintiffs,            :
                                                    :
             -against-                              :      Case No. 1:10-cv-03571-ILG-VVP
                                                    :
                                                    :
HMSHOST CORPORATION, HOST                           :
INTERNATIONAL, INC. and HOST                        :
SERVICES OF NEW YORK,                               :
                                                    :
                              Defendants.           :
-------------------------------------------------------X

## DEFENDANTS' OBJECTIONS TO THE
## MAGISTRATE JUDGE'S JUNE 15, 2012 ORDER


Gregory V. Mersol                                   Patrick M. Muldowney
**BAKER & HOSTETLER LLP**                           **BAKER & HOSTETLER LLP**
3200 PNC Center                                     200 South Orange Avenue
1900 East Ninth Street                              SunTrust Center, Suite 2300
Cleveland, OH  44114-3485                           Orlando, FL  32801-3432
Telephone: (216) 621-0200                           Telephone: (407) 649-4000
Facsimile: (216) 696-0740                           Facsimile: (407) 841-0168
gmersol@bakerlaw.com                                pmuldowney@bakerlaw.com


Margaret Rosenthal
**BAKER & HOSTETLER LLP**
12100 Wilshire Boulevard, 15th Floor
Los Angeles, CA 90025-7120
Telephone: (310) 820-8800
Facsimile: (310) 820-8859
mrosenthal@bakerlaw.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

I.      INTRODUCTION .................................................................................... 1

II.     RELEVANT FACTUAL BACKGROUND ............................................. 2

   A.   Host's Operations ................................................................................. 2

      1.   Assistant Managers ........................................................................ 2

         a.   Assistant Manager Job Descriptions ...................................... 3

         b.   Differences Among ASMs ....................................................... 4

      2.   Easton Stevens And The Opt-Ins .................................................. 5

   B.   The Magistrate Judge's June 15, 2012 Order ..................................... 6

III.    ARGUMENT .......................................................................................... 7

   A.   The Decision To Grant Conditional Certification Of The Proposed Class Is Contrary To Law And Clearly Erroneous ............................................................ 7

      1.   The Class Of ASMs Is Not "Similarly Situated" As To A Uniform Illegal Policy ...... 7

      2.   The Policies Identified By Plaintiffs And The Order Reflect No FLSA Violation ...... 9

         a.   The ASM Job Descriptions Mirror The FLSA Executive Exemption ................. 10

         b.   Host's Handbook For Managers Requires Compliance With FLSA ................... 11

         c.   Host's Ethics Policy Mandates Compliance With The Law ............................... 12

   B.   The Order Errs By Conditionally Certifying A Class Comprised Of 2,000 Individuals Based On The Limited Experiences Of Four Plaintiffs ............................................. 13

   C.   The Order Is Contrary To Law Because It Refuses To Determine If Any Exemptions Apply To The Plaintiff Class ....................................................................... 15

      1.   The Order's Refusal To Consider Issues Related To The "Merits" Is Contrary To Law ...................................................................................................... 16

         a.   Evaluation Of This Case Will Bog The Court In Thousands Of Individual Inquiries ..... 19

         b.   At Least Two Exemptions May Apply To The Proposed Class ......................... 19

            (1)   All Assistant Managers Are Paid More Than $455 Per Week ...................... 20

            (2)   All ASMs Customarily Direct Two Or More Employees ............................. 20

            (3)   Wide Variations In Claimed Primary Duties .............................................. 21

i

(4)     The Power To Make Personnel Decisions Varies Widely Across the Country ................................................................................................... 23

(5)     The Amount Of Non-Managerial Work Varies ................................................ 23

(6)     The Amount Of Discretion And Independent Judgment Varies..................... 24

D.     To The Extent That Conditional Certification Would Be Appropriate, The Order Erred By Holding That Host Committed A Willful Violation ................................... 26

IV.    CONCLUSION ............................................................................................................ 27

## TABLE OF AUTHORITIES

### Cases

*Alli v. Boston Market Co.*, 2011 WL 4006691 (D. Conn. 2011) .................................................. 15

*Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459 (S.D.N.Y. 2008) ......................... 19

*Ayers v. SGS Control Servs., Inc.*, 2004 U.S. Dist. LEXIS 25646 (S.D.N.Y. 2004).................... 10

*Brickey v. Dolgencorp, Inc.*, Case No. 06-CV-6084L (W.D.N.Y. 2003)....................................... 9

*Cano v. Four M Food Corp.*, 2009 WL 5710143 (E.D.N.Y. 2009) ............................................. 15

*Clarke v. JPMorgan Chase Bank*, 2010 U.S. Dist. LEXIS 33624 (S.D.N.Y. Mar. 26, 2010) ..... 29

*Clausman v. Nortel Networks, Inc.*, 2005 U.S. Dist. LEXIS 11501 (S.D. Ind. 2003).................. 18

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602

    (1993) ........................................................................................................................................ 7

*Diaz v. Team Oney, Inc.*, 291 Fed. Appx. 947 (11th Cir. 2008) ................................. 17, 19, 20, 21

*Donovan v. Burger King Corp.*, 675 F.2d 516 (2d Cir. 1982)..................................................... 18

*Donovan v. Burger King*, 672 F.2d 221 (1st Cir. 1982) .............................................................. 12

*El v. Potter,* 2004 U.S. Dist. LEXIS 24447 (S.D.N.Y. 2004)...................................................... 29

*Gani v. Guardian Serv. Indus. Inc.*, 2011 WL 167844 (S.D.N.Y. 2011) .................................... 15

*Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469 (S.D.N.Y. 2010)..................................... 9

*Hallissey v. America Online, Inc.*, 2008 WL 465112 (S.D.N.Y. 2008)....................................... 16

*Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249 (S.D.N.Y. 1997) ..................................................... 10

*Hoffman-La Roche v. Sperling*, 293 U.S. 165 (1989).................................................................... 7

*Holt v. Rite Aid Corp.*, 33 F. Supp. 2d 1265 (M.D. Ala. 2004) .................................................. 17

*Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363 (S.D.N.Y. 2007)................................ 8

*In re Family Dollar FLSA Litigation*, 637 F.3d 508 (4th Cir. 2011)........................................... 21

*In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953 (9th Cir. 2009).............. 16

*Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323 (N.D. Ga. 2005) ............................ 19

*Jenkins v. TJX Cos. Inc.*, 2012 WL 1099964 (E.D.N.Y. Mar. 31, 2012) .................................... 16

*Khan v. Airport Management Services, LLC*, 2011 WL 5597371 (S.D.N.Y. Nov. 16, 2011) ..... 16

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988)........................................................... 28

*Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216 (D. Conn. 2003) .................................. 8, 17

*Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010)................................................................... 28

*Palazzolo-Robinson v. Sharis Management Corp.*, 68 F. Supp. 2d 1186 (W.D. Wash. 1999) .... 21

*Patton v. Thompson Corp.*, 364 F. Supp. 2d 263 (E.D.N.Y. 2005)............................................... 8

*Pfohl v. Farmers Ins. Group*, 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. 2004) ........................... 18

*Prizmic v. Armour, Inc.*, 2006 U.S. Dist. LEXIS 42627 (S.D.N.Y. 2007) .................................... 8

*Ravenell v. Avis Budget Car Rental, LLC*, 2010 WL 2921508 (E.D.N.Y. 2010)........................ 15

*Reich v. Homier Distrib. Co.*, 362 F. Supp. 2d 1009 (N.D. Ind. 2005) ...................................... 18

*Reich v. Waldbaum, Inc.*, 52 F.3d 35 (2d Cir. 1995) ................................................................. 29

*Scholtisek v. The Eldre Corp.*, 229 F.R.D. 381 (W.D.N.Y. 2005)................................................ 10

*Vasquez v. Vitamin Shoppe Industries Inc.*, 2011 WL 2693712 (S.D.N.Y. July 11, 2011) ......... 16

*Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 (9th Cir. 2009) .................................... 16

*Young v. Cooper Cameron Corp.*, 586 F.3d 201 (2d Cir. 2009) .................................................. 28

## **Statutes**

29 C.F.R § 541.100(a).................................................................................................................. 22

29 C.F.R. § 541.102 ....................................................................................................................... 4

29 C.F.R. § 541.106 ................................................................................................................ 13, 20

29 C.F.R. § 541.200(a).................................................................................................................. 22

29 C.F.R. § 541.700(a)............................................................................................................... 24

## I.   <u>INTRODUCTION</u>

These objections are in response to an unprecedented order conditionally certifying an unwieldy nationwide class of thousands of assistant managers spanning 200 different restaurants and franchises across the United States.  On June 15, 2012, Magistrate Judge Viktor Pohorelsky conditionally certified a class under section 16(b) of the Fair Labor Standards Act ("FLSA") consisting of "all persons employed by [Host] as food and beverage assistant managers (excluding California)" who were allegedly misclassified as exempt and did not receive overtime compensation.  In addition, the Magistrate Judge's Order (the "Order")[1] directed Host to provide the names and addresses of, and to send notices to, "all persons employed by [Host] as food and beverage assistant managers (excluding California)" since June 15, 2009.  The Order is not only contrary to law; it effectively concludes that any and all restaurant assistant managers, regardless of whether they work for Burger King, Starbucks, or a five-star steak house, perform the same job duties.

As a result, the Order should be reversed for the following reasons:

1.  The Order is contrary to controlling Second Circuit authority in that it conditionally certifies the class despite the absence of any class-wide illegal policy and despite the fact that each of the policies plaintiffs identify were admittedly lawful.

2.  The Order is contrary to law to the extent that it holds that a class should be conditionally certified absent proof of an illegal policy simply because the employer classifies the position as exempt.

3.  The Order is contrary to law in that plaintiffs presented no evidence of any misclassification of assistant managers for any but a handful of the hundreds of franchises and restaurants types that the defendants operate.

4.  Plaintiffs' four affidavits do not supply enough evidence to demonstrate that there is a group of individuals who are similarly situated across 2,000 assistant managers and 200 different franchises.

---

[1] A copy of the Order is attached as Exhibit 1.

5. Conditional certification is inappropriate because of the highly individualized, fact-intensive inquiry that is required to adjudicate the plaintiffs' claims.

6. If the Court determines that the Order must stand, the notice must be modified with regard to the statute of limitations. Plaintiffs have not proven that Host engaged in a willful violation of the FLSA, necessitating a three-year statute of limitations period.

## II.   **RELEVANT FACTUAL BACKGROUND**

### A.   **Host's Operations**

Defendants HMSHost Corporation, Host International, Inc., and Host Services of New York (collectively "Host") operate restaurants at nearly 75 airports and over 80 turnpike locations, as well as shopping malls, across the country. Locations vary by size, ranging from small turnpike outlets to some of the world's largest airports. (Coleman Lauterbach Dec. ¶ 4).[2] The restaurants run by Host come in a wide variety of forms, ranging from convenience "grab and go" food outlets; to fast food venues; to casual sit-down restaurants; to bars, wine bars, or brew pubs; to fine dining establishments. (*Id.* ¶ 6). Its brands include many household names, such as Burger King, Starbucks, Chili's, Quizno's, California Pizza Kitchen, KFC, Pizza Hut, and over 200 others. (*Id.* ¶ 5). It also runs its own in-house brands, as well as gourmet brands from celebrity chefs. (*Id.*).

Each of the facilities differs from the others based on any number of factors. Airports, by virtue of their size, mix of travelers, and unique security concerns, run differently from motorway outlets. (*Id.* ¶ 9). Different locations have different combinations of concepts and types of restaurants. (*Id.* ¶ 8). Not all brands that exist in airports also exist at turnpike or mall locations, and vice versa. (*Id.*). Each location has its own senior management with discretion on staffing and how to run their own operations. (*Id.* ¶ 30).

### 1.   **Assistant Managers**

---

[2] Unless otherwise noted, all of the cited declarations and deposition testimony excerpts are included with Host's Opposition to Certification (Docket Nos. 40-41).

Host employs assistant store managers ("ASMs") at most of its locations. They are generally responsible for running some portion of the restaurant business at a given location and for supervising anywhere from approximately 20 to over 50 other employees. (Lauterbach Dec. ¶ 18). They are paid well above the rate paid to the hourly associates, making it uneconomical for them to perform lower level work. (Lauterbach Dec. ¶¶ 18, 19).

### a.    Assistant Manager Job Descriptions

There are three levels of Assistant Managers at Host: Assistant Manager I ("ASM I"); Assistant Manager II ("ASM II"); and Assistant Manager III ("ASM III"). (Lauterbach Dep. 17-18). As the example below shows, the job descriptions emphasize the importance of supervising the workforce and performing managerial duties, and echo the definition of an executive exempt employee under 29 C.F.R. § 541.102. For example, the description of an ASM I provides:

- Supervises the day-to-day activities of Shift Supervisors and other non-management associates.
- Assigns work responsibilities, prepares schedules, and ensures that all shifts are covered.
- Prepares daily orders, ensures units are stocked with appropriate levels of product and coaches Shift Supervisors on order procedures.
- Conducts and coordinates on-the-job training for associates, and ensures all associates receive basic skills training to perform their jobs.
- Resolves routine questions and problems and refers more complex issues to higher levels.
- Provides recommendations for hiring, firing, advancement, promotion, or any other status change of associates within the store.

(Lesser Dec. Exh. C, DEF 002118). While all three descriptions stress management duties, the job descriptions for ASM II's and III's note the increasingly high problem-solving responsibility. (*Id.*, DEF 002119, 2120). The job descriptions provide virtually no detail on the day-to-day management of a store, and do not dictate how an ASM should allocate his or her time. (Lauterbach Dep. at 100). There is no dispute in the record that even beyond the requirements

3

in the job descriptions, the duties of an ASM vary significantly depending on myriad factors. (Lauterbach Dep. 70).

### b.     <u>Differences Among ASMs</u>

As explained by Compensation Director Coleman Lauterbach at his deposition, everything ASMs do beyond their basic supervisory responsibilities differ from "location to location, level to level, concept to concept."  (Lauterbach Dep. 69-71); *see also* Pourhadi Dec. ¶ 8(a) ("The day-to-day responsibilities of Assistant Managers differ from operation to operation, but even within the same airport facility").

For example, some ASMs directly supervise the hourly associates, others work through directing the work of hourly shift supervisors, and some actually direct the work of other ASMs. *Compare, e.g.,* (Casey Dec. ¶ 8(e) (serving as Manager on Duty for all the restaurants in the West Palm Beach airport 4-6 times per month)); (Flood Dec. ¶ 8(j) (ASM supervised and helped train other ASMs) with (Kastelitz Dec. ¶ 7(b)) (directly supervising hourly associates).  ASMs can be responsible for a single restaurant (e.g., a single Starbucks), for multiple sites of the same concept (e.g., two or more Starbucks), for multiple sites of different concepts (e.g., a Burger King, Starbucks, and a grab and go outlet), for an entire sit-down restaurant (e.g., a Chili's), for the dining area or kitchen area of a fine dining concept, or for any combination of these arrangements.  (Lauterbach Dec. ¶ 34); *see also* Pourhadi Dec. ¶ 9(a) (ASMs may not be doing the same thing on the same day even within the same branch).  Given that there are over 200 different brands, the variations are practically endless.

Each brand or concept is run differently and presents its own set of challenges.  Grab and go outlets, for example, stress speed and convenience, while finer restaurants need to provide a high level of personal service and a superior dining experience.  Facilities with tipped hourly

employees and/or that serve alcohol will present their own sets of challenges.  (Lauterbach Dec. ¶¶ 34, 35, 37).

The amount of supervisory discretion also varies.  Some facilities are unionized, while others are not.  (Lauterbach Dec. ¶ 17).  Some unions and contracts do not permit management to perform bargaining unit work, while others are more permissive.  (*Id.*); *see, e.g.,* Mersol Dec. Exh. Z (Sea-Tac CBA) at DEF004280 ("Bargaining unit work is intended to be performed by bargaining unit Employees.  It is understood that supervisory and management personnel shall limit their activities to supervisory functions").  In both unionized and non-union facilities, local management can and does provide differing levels of authority and responsibility to make personnel decisions to different ASMs.  Because facilities are of differing sizes, there are also differences in whether senior management is actually on site or not, and during which times.  (Lauterbach Dec. ¶¶ 27, 33).  Further differences are discussed below.

## 2.    Easton Stevens And The Opt-Ins

Plaintiff Easton Stevens and his fellow opt-ins ("plaintiffs") sued his former employer, Host, claiming that he and approximately 2,000 ASMs were misclassified as exempt and entitled to overtime pay under the FLSA.  Stevens worked as an ASM I for nearly two and a half years at Terminal 3 of JFK airport beginning in 2008.  (Stevens Dep. 43, 51, 56, 124).  While working at Starbucks, Burger King, and Ciao restaurants, Stevens admits that his job was to manage and direct other employees, and that Host expected him to do so.  (Stevens Dep. 57, 202-03, 250).

Amanda Siebenaler is a former ASM II who worked at the Minneapolis/St. Paul airport from 2006 to 2008.  (Siebenaler Dep. 28).  Although she claimed at her deposition that she had exaggerated her managerial duties to others (Siebenaler Dep. 43, 165), she did admit that she was responsible for supervising approximately 30 employees at six different locations at any given

time.  (*Id*. 35-36).  These units included Quizno's, A&W, Itasca, Godfather's Pizza, Varsity, and Skol Café & Bar.  (*Id*.).

Robert Vranek, Jr. briefly worked as an ASM II at the Milwaukee Mitchell Airport from August 2008 to February 2009.  During his short tenure at Host, Vranek worked at the airport food court and was responsible for approximately 20 employees at any given time.  (Vranek Dep. 67).  He worked at Burger King, Usinger Deli, Pizza Hut, and Cinnabon.  (*Id*. 44).

Luis Colondres Valentin worked at the non-union Orlando airport from April 2008 to April 2010 as an ASM II.  (Colondres Dep. 40, 113-114, 118).  He was responsible for managing a Burger King, which included the direction of two shift supervisors.  (Colondres Dep. 44, 119).

## B.    The Magistrate Judge's June 15, 2012 Order

After exchanging written discovery and taking the depositions of the named plaintiff and opt-ins, plaintiffs brought a motion before this Court seeking conditional certification and notice of the class of potential plaintiffs who worked as ASMs for Host in the past three years.  In support of their motion, plaintiffs submitted four scant affidavits that contained allegations relating solely to their own experiences as ASMs.  In addition, plaintiffs submitted copies of the handbook and Host's policies, both of which detail Host's entirely legal and FLSA-compliant compensation policy for ASMs.

The Magistrate Judge's Order conditionally certifies a class of "all persons employed by [Host] as food and beverage assistant managers (excluding California), three years from the date of this order to the present."  (Order at 16).

## III.   ARGUMENT

### A.   The Decision To Grant Conditional Certification Of The Proposed Class Is Contrary To Law And Clearly Erroneous

The Order should be reversed because it incorrectly applies the relevant legal principles that govern conditional certification under the FLSA.  Non-dispositive motions decided by a magistrate judge are to be modified or set aside by the district judge assigned to the case where they are contrary to law or clearly erroneous.  Fed. R. Civ. P. 72(a).  An order is contrary to law "when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70, 74 (N.D.N.Y. 2000) (citation and internal quotations omitted).  Likewise, under Rule 72(a), "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [court] on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993).  The Order runs contrary to relevant and accepted case law in several regards.

### 1.   The Class Of ASMs Is Not "Similarly Situated" As To A Uniform Illegal Policy

Congress enacted section 16(b) of the FLSA to limit the size and scope of wage and hour suits.  As the Supreme Court noted in *Hoffman-La Roche v. Sperling*, 293 U.S. 165 (1989), "FLSA's opt-in requirement codifies Congress's desire to: (1) control the volume of minimum wage and overtime litigation by eliminating representative (i.e., opt-out) actions and (2) increase each individual's knowledge and involvement in the action by ensuring that no one's rights are litigated without their knowledge."  *Id.* at 173.  As a result, the decision to authorize notice to thousands of individuals is by no means automatic, and the Court has broad discretion to determine whether notice is appropriate.  *Prizmic*, 2006 U.S. Dist. LEXIS 42627, at *4.

A court may facilitate notice *only* if plaintiffs demonstrate that they are sufficiently "similarly situated" to the opt-in plaintiffs. *See Prizmic v. Armour, Inc.*, 2006 U.S. Dist. LEXIS 42627, at *4 (S.D.N.Y. 2007). Plaintiffs bear this burden. *See, e.g., Diaz v. Electronics Boutique of Am. Inc.*, 2005 WL 2654270, at *3 (W.D.N.Y. 2005).

There is no dispute that to maintain a collective action under section 16(b) of the FLSA, a plaintiff must demonstrate that all of the potential plaintiffs "together were victims of a common policy or plan that *violated the law.*" *See Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 367-68 (S.D.N.Y. 2007) (emphasis added); *Patton v. Thompson Corp.*, 364 F. Supp. 2d 263, 267 (E.D.N.Y. 2005); *Realite v. Ark Rests. Corp.*, 7 F. Supp. 2d 303, 306 (S.D.N.Y. 1998); *see also Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003) (denying motion to proceed as a collective action and noting that plaintiffs must demonstrate that they "were victims of a common policy or plan that violated the law").

Courts have consistently held that when a plaintiff points to *lawful* policies, the class should not be certified. For example, in *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469 (S.D.N.Y. 2010), an assistant store manager brought a class action for failure to pay overtime against his employer department store. The plaintiff asserted that he was similarly situated to the other nationwide assistant managers because "[d]espite [Marshalls'] 'idealized' job descriptions, and facially lawful standardized company policies, Marshalls' ASMs 'in fact spent the majority of their work time performing non-managerial duties.'" *Id.* at *6. The court, however, denied conditional certification, and explained that based on his argument, the plaintiff needed to show that he was similarly situated to the proposed plaintiffs "with respect to his allegation that he spent most of his time performing non-managerial tasks." *Id.* at *8.

Thus, even with only a "modest" factual showing, plaintiffs must still demonstrate a common plan or policy that implicates all prospective class members *and that violates the law.*

The Order, however, sidesteps this requirement and suggests that Host's uniform "facially lawful" policies are "directly contradicted by the allegations of the employees that are subject to the policy." (Order at 8). The disparate allegations of four former assistant managers, according to the Order, is enough to make a modest factual showing sufficient to demonstrate Host's 2,000 or more assistant managers were victims of a common policy or plan that violated the law. This is incorrect, as it ignores case law directly to the contrary. *Brickey v. Dolgencorp, Inc.*, Case No. 06-CV-6084L (W.D.N.Y. 2003) (denying conditional certification by declining to find that facially *lawful* policies may indirectly cause an FLSA violation); *Ayers v. SGS Control Servs., Inc.*, 2004 U.S. Dist. LEXIS 25646 at *4 (S.D.N.Y. 2004) (plaintiff must make a requisite "modest showing" that they were "victims of a common policy or plan that violated the law."; *Scholtisek v. The Eldre Corp.*, 229 F.R.D. 381 (W.D.N.Y. 2005) (same); *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 262 (S.D.N.Y. 1997) (a motion for conditional certification should be denied absent "factual support for the plaintiffs' allegations of widespread wrongdoing.") It also ignores the fact that plaintiffs submitted evidence from only four of 2,000 proposed class members from hundreds of locations.

### 2.   The Policies Identified By Plaintiffs And The Order Reflect No FLSA Violation

Plaintiffs argued that the putative class members are similarly situated merely because they are subject to the same policies contained in the ASM Job Descriptions, Handbook for Managers, and Ethics Policy. The Order, however, identifies no unlawful policy is contained within those documents. Rather, the fact that Host's ASMs were subject to the same *lawful* policy is the precise reason why the plaintiffs here are not similarly situated for the purposes of

conditional certification. As the case law establishes, merely being subject to the same *lawful* policies does not render plaintiffs similarly situated with respect to an illegal common policy or practice. Neither the Order nor plaintiffs can point to any illegal policy employed by Host with regard to the ASMs.

### a. The ASM Job Descriptions Mirror The FLSA Executive Exemption

As explained in Host's Opposition to Class Certification, the job description for any ASM is broad and was designed to mirror the description of managerial duties described in 29 C.F.R. § 541.102. (Lauterbach Dec. ¶ 21). As shown below, even a casual comparison of the ASM job description and the applicable Department of Labor regulations demonstrates that the description was drawn from the very definition of an executive exempt employee:

| ASSISTANT MANAGER I JOB DESCRIPTION | 29 C.F.R. § 541.102 (emphasis added) |
|---|---|
| <ul><li>Supervises the day-to-day activities of Shift Supervisors and other non-management associates.</li><li>Assigns work responsibilities, prepares schedules, and ensures that all shifts are covered.</li><li>Prepares daily orders, ensures units are stocked with appropriate levels of product, and coaches Shift Supervisors on order procedures.</li><li>Conducts and coordinates on-the-job training for associates, and ensures all associates receive basic skills training to perform their jobs.</li></ul> | Generally, "management" includes, but is not limited to, **activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees;** maintaining production or sales records for use in supervision or control; **appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status**; handling employee complaints and grievances; disciplining employees; **planning the work**; determining the techniques to be used; **apportioning the work among the employees**; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be |

| | |
|---|---|
| ▪ Resolves routine questions and problems and refers more complex issues to higher levels.<br><br>▪ Provides recommendations for hiring, firing, advancement, promotion, or any other status change of associates within the store.<br>(Lesser Dec. Exh. C, DEF 002118). | bought, stocked and sold; **controlling the flow and distribution of materials or merchandise and supplies**; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures. |

Because the job descriptions parrot the regulations, they prove the <u>absence</u> of any policy sufficient to certify a class.[3]

### b.     Host's Handbook For Managers Requires Compliance With FLSA

Host's Handbook for Managers confirms not only that Host's policies are lawful, but that they actually <u>require</u> ASMs to comply with applicable law.  (Lauterbach Dep. Exh. 1, DEF000194-595).  The Handbook does not contain any directions on job functions or duties, but rather, details Host's admonition to managers and ASMs to follow EEOC mandates (*Id.*, DEF000227), prohibit workplace harassment (*Id.*, DEF000334-353), comply with the Americans with Disabilities Act (DEF000354), and promote workplace safety policies and risk management (DEF000478).  Nowhere does the manual dictate an ASM's job duties, apart from requiring compliance with applicable law in the making of decisions affecting employees and customers.  Further, the Handbook actually undercuts plaintiffs' arguments as a whole: ASMs would not

---

[3] The First Circuit has found Burger King Assistant Managers to be exempt because their job description "corresponds quite closely" to the example provided in the DOL regulations detailing that an employee can manage while simultaneously performing hourly work.  *See Donovan v. Burger King*, 672 F.2d 221, 223 (1st Cir. 1982) (citing 29 C.F.R. § 541.106).  Nowhere in the Order is this distinction made.

need to be instructed on how to make a personnel decision, unless they were actually making them.

### c.       Host's Ethics Policy Mandates Compliance With The Law

The third and last "uniform policy" plaintiffs cited was Host's Code of Ethical Conduct. That policy does not apply only to ASMs, but to all Host employees.  It counsels associates in the clearest possible terms to "**OBEY ALL LAWS, RULES AND REGULATIONS PROMULGATED BY ALL GOVERNMENT AUTHORITIES**."  (Lesser Dec., Exh. D, DEF001125, emphasis in original).  Not one syllable of the document violates the FLSA or, for that matter, any other law.  It is axiomatic that a policy requiring all employees, including ASMs, to follow the law is <u>not</u> unlawful.

Thus, all of the policies plaintiffs cited demonstrate compliance with the FLSA.  Of course, none of these documents purports to describe the day-to-day work of assistant store managers nor could they given the over 200 types of restaurants the company operates.  Because such policies are not ones that "violate the law" (*Realite*, 7 F. Supp. 2d at 306), let alone ones that "violate the FLSA" (Plf's Brief at 10), plaintiffs did not make the requisite showing for conditional certification.[4]

Ultimately, while both parties agree that the plaintiffs must prove the existence of a nationwide, uniform policy that "violates the FLSA," neither the plaintiffs nor the Order has identified *any evidence that such policy exists*.  All documents cited reflect FLSA compliance, and the reasoning provided in the Order that one can "extrapolate" a violation through plaintiffs' allegations of Host "disregarding" its own policies is contrary to the law.

---

[4] The Order identifies only "policies and procedures" on page 10, and "common policies" on page 11, but never identifies anything illegal about them other than that the four opt-ins claimed not to have performed exempt work.

**B.**     **The Order Errs By Conditionally Certifying A Class Comprised Of 2,000 Individuals Based On The Limited Experiences Of Four Plaintiffs**

Even if it is presumed that plaintiffs had identified a common illegal policy or practice, collective treatment in this case is still inappropriate because of the multitude of different job duties, positions, and responsibilities spread over the 2,000 ASMs, as defined by the Order. Indeed, the Order never holds that Host's human resource policies were facially unlawful. Further, the Order holds that a common policy of exemption was not sufficient for conditional certification (Order at 9), but then extrapolated the experience of *four* former assistant managers who gave conflicting accounts of their duties across all 2,000 or so assistant managers, regardless of franchise, experience, or location.  These managers constituted less than two-tenths of one percent of the class, covered but *four* out of *hundreds* of locations, and a small fraction of the types of restaurants Host operates.  Even the Order concedes (Order at 11) that these four opt-ins provided no testimony of any classification issue including so much as one other person, let alone the entire country.

There is no dispute regarding the enormity and diversity of the positions encompassed by the conditionally certified class.  Each of the brands involved have their method of business, and in many cases, their own brand of franchise-specific standards.  (Lauterbach Dec. ¶ 36). Justifiably so, Host argued that the extremely limited experiences of four plaintiffs, none of whom worked in any ASM position beyond fast-food preparation, could be used to conditionally certify a nationwide class across so many different stores and brands.

It is undisputed that Host's food and beverage business consists of over 200 restaurant brands, ranging from full-service down to convenience-oriented kiosks.  (Order at 11). Additionally, the Order confirms that plaintiffs "have done little to dispute these factual contentions," and that "[n]one have asserted that they have *any* knowledge of AMs working at

full-service restaurants . . . ."  (Order at 11) (emphasis added).  Despite this, however, the Order ignores these statements, runs contrary to the law, and goes on to hold that any discussion of the differences between these brands and positions is somehow irrelevant at this stage of the proceeding.  (*Id.*).  The decision to certify this class has, in no uncertain terms, determined that *every* single assistant manager working at virtually *any* restaurant in the United States, from a convenience store to a white-tablecloth restaurant, performs the same duties.

There is little support for this proposition in the Order, and all of the cited authorities can be quickly distinguished.  The assistant managers in *Ravenell v. Avis Budget Car Rental, LLC*, No. 08-CV-2113, 2010 WL 2921508 (E.D.N.Y. 2010), are not comparable to the assistant managers at issue here.  A rental car company, regardless of its location across the country, effectively performs the same duty.  It does not differ based on the brand of car, nor does the car manufacturer provide a franchise manual to dictate the terms of the agreement and how to convince a customer to rent it.  One plaintiff in this conditionally certified class may spend his time managing and training employees on how to mix drinks at a full-service restaurant, while another is taking and managing the inventory of hamburger components at a Burger King less than forty feet away.  As a result, the cited case law in the Order is inapposite, as it deals exclusively with employees working for one, specific employer with one, specific set of guidelines that were not dictated by a third party.  *See, e.g., Cano v. Four M Food Corp.*, 2009 WL 5710143 (E.D.N.Y. 2009) (grocery store stock employees); *Gani v. Guardian Serv. Indus. Inc.*, 2011 WL 167844 (S.D.N.Y. 2011) (commercial cleaners); *Alli v. Boston Market Co.*, 2011 WL 4006691 (D. Conn. 2011) (assistant managers who worked solely for the Boston Market franchise); *Hallissey v. America Online, Inc.*, 2008 WL 465112 (S.D.N.Y. 2008) (community

14

leader [chat moderators] for America Online).[5]   No court has ever certified a class as diverse as the one in this case.

The error in including all of these diverse positions within a single class is that the Court will be required to make a highly fact-intensive determination with respect to each position.  The inclusion of such individuals with dissimilar roles in a single class defeats the purpose of an FLSA collective action.  The Order, therefore, runs contrary to law.

C.   **The Order Is Contrary To Law Because It Refuses To Determine If Any Exemptions Apply To The Plaintiff Class**

Assuming, again, that there is an illegal policy or practice sufficient to satisfy plaintiffs' burden, the Order is contrary to law when it holds that an examination of whether or not the employees were properly classified as exempt is inappropriate at this stage.   (Order at 13).  Courts have routinely denied conditional certification where determination of exempt status will require a fact-intensive inquiry into the duties performed by each individual employee.   For example, in *Holt v. Rite Aid Corp.*, 33 F. Supp. 2d 1265, 1270 (M.D. Ala. 2004), the plaintiffs sought certification of a collective action of store and assistant managers on grounds that they were misclassified.   As here, the plaintiffs alleged that they spent the majority of their time performing non-exempt duties, such as acting as cashier or cleaning the store.   *Id.* at 1271.   The court denied certification, however, and explained that when the job descriptions reflect management duties, and the claim rests on work outside of the description, the case should not be certified:

_____

[5] Likewise, the fact that the putative class members are all labeled exempt does not necessarily justify certifying a class.   *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 (9th Cir. 2009) (rejecting concept of relying solely on uniform application of exemption); *In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009).   The Order (at 9) acknowledges this authority as well.   *See Jenkins v. TJX Cos. Inc.*, 2012 WL 1099964 (E.D.N.Y. Mar. 31, 2012); *Khan v. Airport Management Services, LLC*, 2011 WL 5597371, at *3-4 (S.D.N.Y. Nov. 16, 2011); *Vasquez v. Vitamin Shoppe Industries Inc.*, 2011 WL 2693712, at *3 (S.D.N.Y. July 11, 2011).

> [T]his case is not a case where janitors are being classified as exempt executives.  Evidence before the court of the formal, written job descriptions of store managers and assistant store managers contains many managerial tasks.  It is only once the Plaintiffs' testimony as to the degree to which other tasks are performed that the application of the exemption becomes questionable.  Therefore, . . . because the application of the executive exemption for merits purposes will require a fact intensive determination, it appears to the court that the similarly situated inquiry also requires an examination of day-to-day tasks.

*Id.*; *see also Morisky v. Pub. Serv. Elec. and Gas Co.*, 111 F. Supp. 2d 493, 497-98 (D.N.J. 2000); *Mike v. Safeco Ins. of Am.*, 274 F. Supp. 2d 216, 220-21 (D. Conn. 2003) (denying certification after concluding determination as to exempt status would require an individualized inquiry); *Diaz*, 2005 WL 2654270 (W.D.N.Y. 2005) (denying conditional certification on grounds that it would require an individual inquiry regarding exempt status); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (denying conditional certification where plaintiff alleged misclassification because it would involve individualized inquiry of assigned tasks); *Reich v. Homier Distrib. Co.*, 362 F. Supp. 2d 1009, 1013-14 (N.D. Ind. 2005) (denying conditional certification because "potential class members [are not] similarly situated where liability depend[s] on an individual determination of each employee's duties."); *Clausman v. Nortel Networks, Inc.*, 2005 U.S. Dist. LEXIS 11501 at *13 (S.D. Ind. 2003) (withdrawing certification because the class members performed their duties in a variety of ways making individual inquiry necessary); *Pfohl v. Farmers Ins. Group*, 2004 U.S. Dist. LEXIS 6447 at *30 (C.D. Cal. 2004) (holding that the determination of the non-exempt status of hundreds of contractors would need to be determined on an employee by employee basis, and therefore inefficient for a collective action).

     **1.**     **<u>The Order's Refusal To Consider Issues Related To The "Merits" Is Contrary To Law</u>**

The Order explains that Host's cited cases, specifically *Donovan v. Burger King Corp.*, 675 F.2d 516 (2d Cir. 1982), are "inapposite as they are decisions that discuss the propriety of the exemption as part of a merits analysis, a task the court does not consider at this point." (Order at 13).  This blanket refusal to look at an issue that touches on the "merits" of plaintiffs' claims is contrary to law.

The Order refused to consider this binding authority or Host's arguments about it on the grounds that Host cites "no cases in this Circuit that hold that individual issues raised by the exemption should bar collective action notice."  (Order at 13-14).  At least one case from this Circuit, however, has held that it is appropriate to consider the merits of a claim when determining whether putative class members are similarly situated under the FLSA.   In *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 467 n.9 (S.D.N.Y. 2008), the court explained:

> Although district courts have held that the merits of a plaintiff's FLSA claim should not be evaluated in determining whether to authorize notice, *see e.g. Lynch*, 491 F. Supp. 2d at 368, these holdings may have derived from jurisprudence discouraging engagement with the merits that was developed in the context of Rule 23 class action certification. Fed. R. Civ. P. 23. But, the Second Circuit in *In re Initial Pub. Offering Sec. Litig.* ("In re IPO") 471 F. 3d 24 (2d Cir. 2006), recently clarified that courts deciding whether to certify a class action must determine that each Rule 23 requirement has been met, and that "the obligation to make such determinations is not lessened by overlap between a Rule 23 and a merits issue." *Id.* at 41.  This Court will, therefore, scrutinize the merits based on the record developed to date by the parties and to the extent necessary to address this motion for authorization of notice.

*Amendola*, 558 F. Supp. 2d at 467 n.9.  The court in *Amendola* did finally determine that an exemption did apply to the potential class, and declined to issue notice.

Here, the *Burger King* case cited in the Order has effectively already settled the issue and determined that Burger King ASMs are exempt.  *Burger King*, 675 F. 2d at 517.  Similarly, other courts have concluded that assistant managers like those at Host perform exempt work.  *See, e.g.,*

17

*Diaz v. Team Oney, Inc.*, 291 Fed. Appx. 947 (11th Cir. 2008) (holding that a restaurant assistant manager was exempt); *Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323 (N.D. Ga. 2005) (assistant managers held exempt even though they spent 90% of their time performing non-exempt work because the court determined that those duties were performed simultaneously with their managerial functions).

Likewise, when class members claim to perform both exempt and non-exempt work, as plaintiffs do here, the Court must undertake a review of the importance of each. Managers may perform a large number of non-exempt duties yet keep their exempt status, so long as the exempt duties are primary. The Department of Labor, in fact, specifically recognizes the need to analyze the nature and extent of such work for Assistant Managers in the food and beverage industry:

> For example, an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management. An assistant manager can supervise employees and serve customers at the same time without losing the exemption. An exempt employee can also simultaneously direct the work of other employees and stock shelves.

29 C.F.R. § 541.106.

In *Diaz v. Team Oney, Inc.*, 291 Fed. Appx. 947 (11th Cir. 2008), the plaintiff assistant manager testified that he felt his "primary duty" at Papa John's Pizza was to serve customers by cutting up pizzas, routing deliveries, greeting customers, and cleaning the store. *Id.* at 949. The court agreed that he performed such work, but noted that his managerial duties as "highest ranking employee on duty during the majority of his shifts, in which he supervised drivers, counterpersons, and cooks, apportioned work, made deposits, filled out required forms, interviewed prospective employees, and engaged in local restaurant marketing" were significantly more important to the operation of the restaurant than his non-managerial tasks.

18

Because these duties were the most important, the Eleventh Circuit held that he was exempt.  (*Id.* at 950).  *See also Palazzolo-Robinson v. Sharis Management Corp.*, 68 F. Supp. 2d 1186 (W.D. Wash. 1999) (determining after analyzing duties that assistant managers who spent more than 50 percent of their time on the floor performing non-managerial tasks such as pouring coffee and taking out the trash "never stopped being in charge of the facility" and were executive exempt). Thus, the Court's inquiry will involve not only determining the work of each assistant store manager, but also weighing which of their myriad duties are the most important.

### a. Evaluation Of This Case Will Bog The Court In Thousands Of Individual Inquiries

Because the Court may properly examine the individual issues at play in the conditionally certified class, it will be forced to consider the exempt status of the ASMs with regard to the applicable regulations, and factors such as the time and importance of resolving employee grievances, addressing complaints from customers, and dealing with non-reporting employees, employee theft, staffing needs, supervising counter employees and cooks, apportioning work, making deposits, interviewing prospective employees, engaging in local restaurant marketing, and the relative importance of their different duties.   *See, e.g., In re Family Dollar FLSA Litigation*, 637 F.3d 508 (4th Cir. 2011) (affirming summary judgment regarding a store manager's exempt status); *Diaz*, 291 Fed. Appx. at 950.  As explained below, an analysis of the regulations' requirements reflect that each of these factors is either undisputed or varies widely among the putative class members in this case.

### b. At Least Two Exemptions May Apply To The Proposed Class

Host ASMs may potentially be subject to either or both of two FLSA exemptions, the executive and administrative.  As set forth above, the executive exemption, from which the job descriptions were drawn, requires that: 1) they receive a salary at a rate of at least $455 per

week; 2) their primary duty is management; 3) they customarily and regularly direct the work of two or more other employees; and 4) they have the authority to hire or fire other employees or their suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight.  29 C.F.R § 541.100(a).

The administrative exemption may also exempt the work of ASMs when: 1) they are paid a salary of at least $455 per week; 2) their "primary duty is the performance of office or non-manual work directly related to the management or general operations of the employer or the employer's customers"; and 3) their primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.  29 C.F.R. § 541.200(a).

### (1)     All Assistant Managers Are Paid More Than $455 Per Week

All ASMs earn more than $455 per week.  (Lauterbach Dec. ¶ 25).  Thus, there is no violation of the FLSA regarding the weekly pay of ASMs.

### (2)     All ASMs Customarily Direct Two Or More Employees

The job descriptions specifically mandate that ASMs direct other employees.  (Lesser Dec. Exh. B; Lauterbach Dep. 71).  Stevens admitted that he directed the work of at least 8 crew members working at Burger King on a daily basis, and gave them instructions such as when to run the sandwich line and when to get on the cash register.  (Stevens Dep. 69, 74).

Similarly, plaintiff Siebenaler admitted that she was responsible for supervising approximately 30 employees at six different locations at any given time.  (Siebenaler Dep. 35-36).  On his resume, Vranek stated that he directed the work of approximately 20 employees. (Vranek Dep. Exh. 1).

A quick survey of other ASMs across the country confirms the fact that they are responsible for the direction of anywhere from 10 to over 50 employees.  For example, an ASM

at the West Palm Beach Airport oversees the day-to-day work of approximately 14 hourly associates (Auer Dec. ¶ 7(b)), while an ASM at the Minneapolis/St. Paul Airport (the same airport as opt-in Siebenaler) oversees the work of 50-60 hourly associates (Maher Dec. ¶ 7(b)). An ASM at Salt Lake City Airport responsible for managing four concepts oversees the work of approximately 40 hourly associates (Gailey Dec. ¶ 7(b)), and an ASM at the Lihue Airport in Hawaii directs the work of 28-30 employees at two concepts (Ortiz Dec. ¶ 7(b)). The lone ASM at Boise International Airport directs the work of 70-80 hourly associates. (Jensen Dec. ¶ 7(b)). *See also* (Kelly Dec. ¶ 7(b) (directing the work of 12-13 hourly associates at his restaurant)); (Kastelitz Dec. ¶ 7(b) (directing the work of 15-20 hourly associates on any given shift)); (Alberts Dec. ¶ 7(b) (directing the work of approximately 120 associates)); (McLaughlin Dec. ¶ 7(b) (directing the work of 70 associates)).

Thus, while there is variation in the <u>number</u> of hourly employees directed, it also appears that there is no uniform claim that ASMs did not direct the work of at least two others.

### (3)  <u>Wide Variations In Claimed Primary Duties</u>

There are different primary duties among the members of the proposed class. The regulations define "primary duty" as the "principal, main, major, or most important duty that an employee performs." 29 C.F.R. § 541.700(a). "Determination of an employee's primary duty must be based on all of the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.*

Plaintiff Stevens and the opt-ins claim that they weren't able to manage for various reasons, but spent most of their time performing hourly work. However, other ASMs testified that they did indeed manage. (Lauterbach Dec. ¶¶ 15, 18, 19, 22); *see also, e.g.,* (Kelly Dec. ¶ 8(c)) (describing his many job duties); (Jensen Dec. ¶ 8(e)) (describing his job traveling from

21

unit to unit "supervising the other associates and supervisors")); (Alberts Dec. ¶ 8(a)) (describing his duties floating between stores and directing the work of others).

Indeed, the amount of managerial authority and responsibilities varied widely across the country.  For example, some ASMs train new employees.  *See, e.g.,* (Auer Dec. ¶ 8(c)); (Ortiz Dec. ¶ 8(c)); (Kastelitz Dec. ¶ 8(c)); (Maher Dec. ¶ (8(b)).  Other ASMs do not directly train new employees.  *See, e.g.,* (Gailey Dec. ¶ 8(d)); (Benedetto Dec. ¶ 8(e)).  At least one ASM performs all of the functions of a Human Resources department, including administering FMLA and other types of leave.  (Wilkinson Dec. ¶ 8(e)).

Similarly, some ASMs monitor sales figures and track customer trends.  *See, e.g.,* (Jensen Dec. ¶ 8(n)); (Flood Dec. ¶ 8(m)).  Some ASMs even create sales contests for their associates to boost morale and earnings.  *See, e.g.,* (Jensen Dec. ¶ 8(j)); (Alberts Dec. ¶ 8(e)).  Other ASMs do not create sales contests, or are prohibited from doing so.  *See, e.g.,* (Gailey Dec. ¶ 8(i)); (Flood Dec. ¶ 8(g)) (union presence prohibits sales contests among associates).

ASMs also spend time managing inventory and ordering supplies.  *See, e.g.,* (Casey Dec. ¶ 8(c)); (Ortiz Dec. ¶ 8(c)).  Other ASMs spend a majority of their time managing inventory and increasing efficiency.  *See* (Alberts Dec. ¶ 8(l)) (testifying that he solicits and designs inventory management programs); (Kelly Dec. ¶ 8(e)) ("I purchase all liquor, perform all beer transfers, and order small wares…for all of the restaurants at the [West Palm Beach] airport").  Plaintiff Stevens and opt-ins Siebenaler and Vranek all claimed before their lawsuit that they also managed their operations, but then later claimed in their depositions that they did <u>not</u> manage much at all.  (Stevens Dep. 209; Siebenaler Dep. 43; Vranek Dep. 78).

Thus, the absence of this detailed examination in the Order elicits two conclusions.  First, if plaintiffs' evidence is taken as true and compared with that of other ASMs, there is a

22

significant variation in the level of managerial responsibility.  Second, resolution of claims such as that of Stevens and the current opt-ins will force the court to review each potential opt-in's claims individually to determine which of their conflicting accounts of their job duties should be believed.

**(4)    The Power To Make Personnel Decisions Varies Widely Across the Country**

There is significant variety among ASMs regarding their ability to hire, fire, and promote employees.   Again, the job description states that ASMs have the power to make recommendations regarding hiring and firing.  *See Job Description, infra* at III.A.1.a.

The amount of power that an ASM has in order to do this, however, varies depending on location, managerial style, and other factors.  For example, some ASMs have the authority to hire a good candidate on the spot, without consulting their Store Manager for approval.  *See, e.g.*, (Gailey Dec. ¶ 8(g)).  Other ASMs can only make recommendations for hiring, which are almost always followed by higher management.  *See*, *e.g.*, (Jensen Dec. ¶ 8(h)); (Ortiz Dec. ¶ 8(a)); (Maher Dec. ¶ 8(a)).  Similarly, some ASMs are permitted to terminate an employee entirely on their own initiative, without permission from the Store Manager.  *See, e.g.*, (Auer Dec. ¶ 8(b)); (Kelly Dec. ¶ 8(b)).   Other ASMs, however, are permitted only to suspend an employee following a serious infraction, and/or must receive permission from a Store Manager or Human Resources before terminating them.  *See, e.g.,* (Jensen Dec. ¶ 8(i)); (Alberts Dec. ¶ 8(f)); Gailey Dec. ¶ 8(f)); Ortiz Dec. ¶ 8(b)).  An ASM is, however, expected to discipline associates as part of his or her managerial duties.  *See, e.g.,* (Jensen Dec. ¶ 8(i)); (McLaughlin Dec. ¶ 8(b)); (Kastelitz Dec. ¶ 8(b)); (Ortiz Dec. ¶ 8(b)); (Kelly Dec. ¶ 8(b)); (Auer Dec. ¶ 8(b)).

**(5)    The Amount Of Non-Managerial Work Varies**

The amount of time an ASM may spend performing non-exempt work also varies, and the Court will need to analyze, on a case-by-case basis, which duties are primary.  *See* 29 C.F.R. §§ 541.106, 541.700(b).  It is uncontested that many, if not all, ASMs would occasionally jump on the line to assist the hourly associates during busy times and high customer traffic periods. The amount of time that they did this, however, varied from one location to another, and based on the individual ASM.  For example, many ASMs only jump on the line on rare occasions, or for brief periods of time.  *See, e.g.,* (Jensen Dec. ¶ 8(g)) (spending only 30 minutes a day "on the line"); (McLaughlin Dec. ¶ 8(c)) (testifying that he would spend less than two hours per shift performing hourly work); (Gailey Dec. ¶ 8(m)) (spending less than two to three hours a day "on the line"); (Kasteliz Dec. ¶ 8(g)) (spending at most 10-25% of his time performing hourly work); (Alberts Dec. ¶ 8(k)) (testifying that he would only perform hourly work during high-traffic times); (Auer Dec. ¶ 8(d)) (the vast majority of an ASMs time is not spent "on the line").  This variation should come as no surprise, because defendants operate thousands of restaurants of different types at dozens of locations and over 200 distinct brands.

Plaintiff and the opt-ins gave different reasons why they did not manage.  Stevens contended that he was expected to manage, but did not believe he had enough staff to do so. (Stevens Dep. 209).  Opt-in Vranek claimed that he could not manage because the union effectively ran the Milwaukee airport.  (Vranek Dep. 78).  Siebenaler was barely aware of the union in Minnesota, but attributed her problems to intrigue among her subordinates.  (Siebenaler Dep. 157-58).  Colondres, who worked at a non-union facility, complained that his local manager simply overruled every decision he made.  (Colondres Dep. 124, 149, 167-68).

### (6)    The Amount Of Discretion And Independent Judgment Varies

According to the job descriptions, ASMs at Host are required to use discretion and independent judgment.  They are responsible for scheduling, assigning work, making recommendations for hiring and firing, and evaluating the hourly associates.  *See Job Description, infra* at III.A.1.a.  Many ASMs testified to performing these functions, and more.

For example, in contrast to Stevens' alleged experience, it is commonplace for ASMs to schedule hourly associate work.  *See, e.g.,* (Jensen Dec. ¶ 8(k)); (Alberts Dec. ¶ 8(h)); (Gailey Dec. ¶ 8(h)); (Kastelitz Dec. ¶ 8(c)) (including the scheduling of overtime); (Auer Dec. ¶ 8(c) (same)).  Likewise, ASMs are expected to evaluate and review hourly associates.  *See, e.g.,* (McLaughlin Dec. ¶ b)); (Auer Dec. ¶ 8(c)); (Maher Dec. ¶ 8(d)).  Many ASMs not only evaluate, but also recommend associates for promotion.  (Jensen Dec. ¶ 8(o)); (Alberts Dec. ¶ 8(j)); (Gailey Dec. ¶ 8(k)).

While not all ASMs have the power to terminate an employee on the spot, an ASM's opinion regarding an hourly associate's termination will be given significant weight.  *See, e.g.,* (Gailey Dec. ¶ 8(f)); (Ortiz Dec. ¶ 8(b)); (Auer Dec. ¶ 8(b)).  The same is true regarding hiring decisions.  *See, e.g.,* (Jensen Dec. ¶ 8(h)) ("If I indicate that I don't think the person is a good fit, they will not hire that person"); (Alberts Dec. ¶ 8(g)); (Maher Dec. ¶ 8(a)).

These declarations stand in contrast to much of the testimony of the four opt-ins.  For example, Vranek stated that the union eviscerated his decisions-making abilities.  (Vranek Dep. 55-57).  Similarly, Siebenaler testified that without being able to command the respect of her employees, she was unable to effectively direct and manage them.  (Siebenaler Dep. 157-58).  Thus, if plaintiffs' evidence is believed, the amount of discretion and judgment employed by ASMs fluctuated from facility to facility.

Ultimately, plaintiffs' proposed class involves thousands of individual choices, decisions, and recommendations made on a daily basis across the country by thousands of employees in over 200 brands of restaurants.  The Order is contrary to law when it refuses to acknowledge or even address this evidence when refusing to rule on the "merits" of the lawsuit.

### D.   To The Extent That Conditional Certification Would Be Appropriate, The Order Erred By Holding That Host Committed A Willful Violation

While Host denies that any conditionally certified class is appropriate, if the Court upholds the Order, Host maintains that notice should only be sent to employees who worked for the defendants for the last two years, rather than three.

The purpose of the judicially created two-step procedure is to permit notice to the class and opt-ins when the plaintiff has made the minimal showing of a common illegal policy.  *Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010).  The burden is on the plaintiffs to show willfulness on the part of the employer.  *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009).  An employer does not willfully violate the FLSA even if it acted "unreasonably, but not recklessly, in determining its legal obligation."  *Clarke v. JPMorgan Chase Bank*, 2010 U.S. Dist. LEXIS 33624, at *10 (S.D.N.Y. Mar. 26, 2010).  As Host has explained in detail above, plaintiffs have failed to prove willfulness here.

Plaintiffs cannot point to, nor is there any evidence identified in the Order, of an illegal policy.  The only record evidence, obtained from Coleman Lauterbach, is that Host believed it had properly classified its ASMs.  This falls far short of the necessary showing that the employer "willfully" misclassified the employees or showed reckless disregard for its action, as the case law requires.  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988); *see also Reich v. Waldbaum, Inc.*, 52 F.3d 35 (2d Cir. 1995); *see also El v. Potter,* 2004 U.S. Dist. LEXIS 24447,

at *15 (S.D.N.Y. 2004) ("Willfulness cannot be found where the employer acted negligently or assumed in good faith, but incorrectly, that its conduct complied with the FLSA.")

The Order's instruction to extend the period back three years based solely on plaintiffs allegations of willfulness turns solely on his statement that Host has "cited no authority to the contrary." (Order at 15). However, the difference here between two and three years is not merely academic. Plaintiffs, not Host, bear the burden of establishing the grounds for conditional certification. Anyone who worked in the prior two years for Host would get notice under the current order. The effect of the Order, however, is to increase the class size by roughly a third, but *all* of the additional members will be those who stopped working between two and three years ago. Those former employees will all get notice and the opportunity to opt-in even though they cannot recover *anything* unless they prove a willful violation, despite the fact that there is *no evidence of such violation*.

As a result, hundreds of people with *no claim* will be sent notice, thus miring the case with myriad timeliness issues, motion practice, discovery, and related problems. The addition of such parties and claims will serve only to make this case harder, not easier, for the Court to manage, and will also lead to disappointed claimants who may opt-in, be required to participate in discovery, only to then be told later that their claims are time-barred. Thus, without any evidence to indicate willfulness, as required by 29 U.S.C. § 255(a), the Order will mire the court's calendar and patience, as well as the potential opt-in's lives.

IV.   <u>CONCLUSION</u>

The June 15, 2012 Order is unprecedented, contrary to law and clearly erroneous, and should be reversed. It acknowledges the need for plaintiffs to identify a common illegal policy, but certifies the class in the absence of one. It extrapolates the experience of four individuals, who themselves had differing experiences, across thousands of employees, and hundreds of

franchises and locations without any evidence that the experiences are the least bit common.

Finally, it certified a class for a three-year period despite the lack of *any* evidence of a willful

violation.

Respectfully submitted,

*/s/ Gregory V. Mersol*
Gregory V. Mersol
**BAKER & HOSTETLER LLP**
3200 PNC Center
1900 East Ninth Street
Cleveland, OH  44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
gmersol@bakerlaw.com

Patrick M. Muldowney
**BAKER & HOSTETLER LLP**
E-mail:  pmuldowney@bakerlaw.com
200 South Orange Avenue
SunTrust Center, Suite 2300
Orlando, FL  32802-0112
Phone: (407) 649-4000
Fax: (407) 841-0168

Margaret Rosenthal
**BAKER & HOSTETLER LLP**
12100 Wilshire Boulevard, 15th Floor
Los Angeles, CA 90025-7120
Telephone: (310) 820-8800
Facsimile: (310) 820-8859
mrosenthal@bakerlaw.com

*Attorneys for Defendants*

28

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 29, 2012, a true and correct copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.


*/s/ Gregory V. Mersol*　　　　　
One of the Attorneys for Defendants