UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- x
EASTON STEVENS,                                    :
Individually and on Behalf of All                  :
Other Persons Similarly Situated,                  :
                                                   :
                          Plaintiffs,              :
                                                   :
             -against-                             :    Case No. 1:10-cv-03571-ILG-VVP
                                                   :
                                                   :
HMSHOST CORPORATION, HOST             :
INTERNATIONAL, INC. and HOST         :
SERVICES OF NEW YORK,                :
                                                   :
                          Defendants.              :
------------------------------------------------------- x

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR DECERTIFICATION

Gregory V. Mersol                          Patrick M. Muldowney
**BAKER & HOSTETLER LLP**                  **BAKER & HOSTETLER LLP**
3200 PNC Center                            200 South Orange Avenue
1900 East Ninth Street                     SunTrust Center, Suite 2300
Cleveland, OH  44114-3485                  P.O. Box 112
Telephone: (216) 621-0200                  Orlando, FL  32802-0112
Facsimile: (216) 696-0740                  Telephone: (407) 649-4000
gmersol@bakerlaw.com                       Facsimile: (407) 841-0168
                                           pmuldowney@bakerlaw.com

Margaret Rosenthal
**BAKER & HOSTETLER LLP**
12100 Wilshire Boulevard, 15th Floor
Los Angeles, CA 90025-7120
Telephone: (310) 820-8800
Facsimile: (310) 820-8859
mrosenthal@bakerlaw.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

## Contents

I.     INTRODUCTION ...........................................................................................1

II.    STATEMENT OF FACTS ..............................................................................2

  A.  HOST'S OPERATIONS ............................................................................2

  B.  PROCEDURAL HISTORY .......................................................................5

     **i.    The Class Generated Limited Participation By Potential Opt-Ins.** .........5

     **ii.   The Deposition Pool Is Skewed.** ..........................................................6

III.   ARGUMENT ................................................................................................7

    THE CONDITIONAL CLASS SHOULD BE DECERTIFIED BECAUSE THE ASMS
    CANNOT SHOW THAT THEY ARE SIMILARLY SITUATED. ...................................7

  A.  DECERTIFICATION IS APPROPRIATE WHEN THE OPT-INS ARE NOT
      SIMILARLY SITUATED WITH RESPECT TO AN ANALYSIS OF THEIR EXEMPT
      STATUS UNDER THE FLSA..................................................................10

     **i.    The Wide Range Of ASM Duties Confirms That Decertification Is Appropriate.**
       ........................................................................................................10

     **ii.   The Opt-Ins Possess Varying Hiring And Firing Authority.** ..................19

     **iii.  The Opt-Ins Possess A Wide Variance Of Interviewing Authority.** .........22

     **iv.  ASMs Maintain Divergent Authority With Respect To Discipline.** ..........23

     **v.   Some Asms Are In Charge Of Scheduling While Others Have No Scheduling Role
       At All.** ...............................................................................................24

     **vi.  ASMs Differ In Their Authority To Conduct Performance Evaluations.** ...........26

  B.  THE DIVERSE FRANCHISES REQUIRE THAT THE OPT-INS PERFORM DIVERSE
      JOB DUTIES THAT VARY FROM CONCEPT TO CONCEPT....................................28

  C.  PERMITTING CERTIFICATION WILL PRECLUDE HOST'S INDIVIDUALIZED
      DEFENSES. .........................................................................................32

  D.  PLAINTIFFS CANNOT RELY ON PERFORMANCE OF CONCURRENT DUTIES
      TO ESTABLISH CLASS-WIDE EXEMPT STATUS.......................................34

  E.  PLAINTIFFS CANNOT SHOW ANY REASONABLE METHOD FOR
      DETERMINING DAMAGES ON A CLASS-WIDE BASIS. .........................................36

IV.   CONCLUSION ............................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alli v. Boston Market Co.*,
 2011 WL 3924246 (D. Conn. Sept.7, 2011)................................................32

*Amash v. Home Depot U.S.A., Inc.*,
 1:12-CV-837, 2013 WL 6592205 (N.D.N.Y. Dec. 16, 2013).................................32

*Anderson v. Cagle's, Inc.*,
 488 F.3d 945 (11th Cir. 2007) ............................................................11

*Aquilino v. Home Depot, U.S.A., Inc.*,
 CIV.A. 04-04100 PGS, 2011 WL 564039 (D.N.J. Feb. 15, 2011).........................28

*Barenboim v. Starbucks Corp.*,
 21 N.Y.3d 460 (N.Y. 2013)..............................................................28

*Brumbelow v. Quality Mills, Inc.*,
 462 F.2d 1324 (5th Cir. 1972) ..........................................................32

*Coffaro v. Crespo*,
 721 F. Supp.2d 141 (E.D.N.Y. 2010) ....................................................32

*Comcast Corp. v. Behrend*,
 133 S. Ct. 1426 (2013) ................................................................37

*Diaz v. Team Oney, Inc.*,
 291 Fed. App'x 947 (11th Cir. 2008) ...................................................34

*In Re: Dollar Gen'l Corp., FLSA Litig.*,
 No. 7:02-cv-673 (N.D. Ala. Aug. 8, 2006) Doc. 707 ....................................36

*Donovan v. Burger King Corp.*,
 672 F.2d 221 (1st Cir. 1982)...........................................................28

*Donovan v. Burger King Corp.*,
 675 F.2d 516 (2d Cir. 1982) .......................................................28, 34

*Dorvil v. Host Int'l, Inc.*,
 12-23293-CIV (S.D. Fla. Mar. 6, 2013) .....................................12, 19, 28, 35

*Espenscheid v. DirectSat USA, LLC*,
 705 F.3d 770 (7th Cir. 2013) ........................................................2, 6, 8, 37

*Gardner v. W. Beef Properties, Inc.*,
  07-CV-2345 NGG JMA, 2013 WL 1629299 (E.D.N.Y. Mar. 25, 2013)........................*passim*

*Green v. Harbor Freight Tools USA, Inc.*,
  888 F. Supp. 2d 1088 (D. Kan. 2012) ..................................................................10, 17, 19, 20

*Higueros v. New York State Catholic Health Plan, Inc.*,
  CV07-418ADSETB, 2009 WL 3463765 (E.D.N.Y. Oct. 21, 2009).........................................6

*Hipp v. Liberty Nat. Life Ins. Co.*,
  252 F.3d 1208 (11th Cir. 2001) ...........................................................................................8

*Jankowski v. Castaldi*,
  01CV0164(SJF)(KAM), 2006 WL 118973 (E.D.N.Y. Jan. 13, 2006) ...................................6

*Johnson v. Big Lots Stores, Inc.*,
  561 F. Supp. 2d 567 (E.D. La. 2008) ...........................................................................*passim*

*Jones v. Virginia Oil Co.*,
  2003 WL 21699882 (4th Cir. 2003) ..................................................................................34

*Joza v. WW JFK LLC*,
  2010 WL 3619551 (E.D.N.Y. Sept. 10, 2010) ..................................................................32

*Knott v. Dollar Tree Stores, Inc.*,
  897 F. Supp. 2d 1230 (N.D. Ala. 2012) .....................................................9, 10, 13, 20, 28

*Matamoros v. Starbucks Corp.*,
  CIV.A. 08-10772-NMG, 2011 WL 1044654 (D. Mass. Feb. 8, 2011) .................................28

*McLaughlin v. Richland Shoe Co.*,
  486 U.S. 128, 108 S. Ct. 1677 (1988) ...............................................................................33

*Mooney v. Aramco Servs. Co.*,
  54 F.3d 1207 (5th Cir. 1995) .............................................................................................9

*Morangelli v. Chemed Corp.*,
  10 CIV 00876, 2011 WL 7475 (E.D.N.Y. Jan. 1, 2011) .......................................................6

*Morisky v. Pub. Serv. Elec. & Gas Co.*,
  111 F. Supp. 2d 493 (D. N.J. 2000)...................................................................................11

*Murray v. Stuckey's, Inc.*,
  939 F.2d 614 (8th Cir. 1991) .............................................................................................35

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010) ..............................................................................................8

*Reyes v. Texas Ezpawn, L.P.*,
   2007 WL 101808 (N.D. Tex. Jan. 8, 2007) ..............................................*passim*

*Stevens v. HMSHost Corp.*,
   CV-10-3571 (E.D.N.Y. June 15, 2012) ................................................... 1, 5, 8

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ..............................................................................*passim*

*Young v. Cooper Cameron Corp.*,
   586 F.3d 201 (2d Cir. 2009) ............................................................................ 33

*Zavala v. Wal-Mart Stores, Inc.*,
   691 F.3d 527 (3d Cir. 2012) ........................................................................ 8, 28

**Statutes**

29 U.S.C. § 213(a)(1) ........................................................................................ 10

29 U.S.C. § 216(b) ........................................................................... 7, 8, 9, 11, 36

29 U.S.C. § 255 .................................................................................................. 33

**Other Authorities**

29 C.F.R. 541.700(b) ........................................................................................ 34

29 C.F.R. 541.700(c) ........................................................................................ 34

29 C.F.R. § 541.102 ...................................................................................... 3, 22

69 Fed. Reg. 22136-37 (April 23, 2004) ......................................................... 34

Fed. R. Civ. P. 23 ............................................................................................ 2, 8

## I.    <u>INTRODUCTION</u>

When this Court conditionally certified the class of Assistant Store Managers ("ASMs"), it noted that at the decertification stage, HMSHost Corporation, Host International, Inc., and Host Services of New York (collectively "Host") would have the opportunity to demonstrate a lack of similarity with a more full evidentiary record.  *Stevens v. HMSHost Corp.*, CV-10-3571, Doc. 49 at 3-4, 15 (E.D.N.Y. June 15, 2012).  Nearly two years later, and after exchanging hundreds of thousands of pages of discovery, as well as conducting an additional fourteen depositions of opt-ins, that full evidentiary record demonstrates widespread dissimilarities among the ASMs.  This case cannot proceed as a collective action.

Plaintiffs cannot meet their burden of proof that the ASMs are similarly situated to justify collective treatment.  Instead, the evidence reflects a group of disparate employees who exercise varying levels of managerial authority in completely different management settings.  Thus, a determination of whether one ASM is correctly classified as exempt under Fair Labor Standards Act ("FLSA") has no bearing on an ASM working in a different location.  No one set of operative facts exist that would permit a jury to pass judgment on the entire class of ASMs because of the vast distinctions that permeate through the class.

For example, considerable discrepancies exist with respect to the opt-ins' admitted authority to hire, interview, manage, discipline, schedule, and evaluate associates.  Among just the deponents and declarants, there are allegedly class members who "never" perform certain exempt tasks and those who "regularly" or "always" perform such job duties.  Inquiry regarding these job duties is essential because an ASM may or may not be classified as exempt based on whether they perform the exempt duties.  As shown in more detail below, this is just one of many questions that must be answered on a case-by-case, individual ASM basis.

Collective actions, like Rule 23 class actions, cannot proceed when the representative proof offered by plaintiffs "impede[s] the generation of common answers" for all plaintiffs. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *see also Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) (certification standards for Rule 23 and FLSA collective actions are the same). The ASMs have material differences that seriously impede their representation of the class. These differences pertaining to their job duties show that they are not similar and that collective treatment is not possible without violating the due process rights of non-testifying class members and Host. Accordingly, this Court should decertify the class, thereby allowing each plaintiff's disparate claims to be resolved individually.

## II.   STATEMENT OF FACTS

### A.   HOST'S OPERATIONS

Host operates restaurants at nearly 75 airports and over 80 turnpike locations, as well as in shopping malls. Locations vary by size, ranging from small turnpike outlets to some of the world's largest airports. (Declaration of Coleman Lauterbach ("Lauterbach Dec."), attached as Exhibit A, ¶ 4). The restaurants run by Host come in a wide variety of forms, ranging from convenience "grab and go" food outlets; to fast food venues; to casual sit-down restaurants; to bars, wine bars, or brew pubs; to fine dining establishments. (*Id.* ¶ 6). Its brands include many household names, such as Burger King, Starbucks, Chili's, Quizno's, California Pizza Kitchen, KFC, Pizza Hut, and over 200 others. (*Id.* ¶ 5). It also runs its own in-house brands, as well as gourmet brands from celebrity chefs. (*Id.*).

Each of the facilities differs from the others based on any number of factors. Airports, by virtue of their size, mix of travelers, and unique security concerns, run differently from motorway outlets. (*Id.* ¶ 9). Different locations have different combinations of concepts and types of restaurants. (*Id.* ¶ 8). Not all brands that exist in airports also exist at turnpike or mall

locations, and vice versa.  (*Id.*).  As a result, each location has its own senior management with discretion on staffing and how to run their operations.  (*Id.* ¶ 30).

Host employs ASMs at most of its locations.[1]  ASMs are generally responsible for running some portion of the restaurant business at a given location and for supervising anywhere from approximately 20 to over 50 other employees.  (Lauterbach Dec. ¶ 18).  They are paid well above the rate paid to the hourly associates, making it uneconomical for them to perform lower level work.  (Lauterbach Dec. ¶¶ 18, 19).  It is cheaper for Host to have hourly associates perform hourly associate work exclusively and pay them overtime than to have salaried managers perform hourly associate work.  (12/3/13 Deposition of Coleman Lauterbach ("Lauterbach Dep. II"), attached as Exhibit B, at 57).

As explained in detail below, the differences in store size, brand, and location profoundly affect the work of ASMs.  It goes without saying that an ASM at a large full-service restaurant in a busy airport with upwards of 80 associates is likely to spend more time interviewing, hiring, and evaluating associates than an ASM at a sleepy roadside coffee shop.

---

[1]  There are three levels of Assistant Managers at Host: Assistant Manager I ("ASM I"); Assistant Manager II ("ASM II"); and Assistant Manager III ("ASM III"). (5/11/11 Deposition of Coleman Lauterbach ("Lauterbach Dep. I") 17-18, attached as Exhibit C). As the example below shows, the job descriptions emphasize the importance of supervising the workforce and performing managerial duties, and echo the definition of an executive exempt employee under 29 C.F.R. § 541.102. For example, the description of an ASM I provides:

- Supervises the day-to-day activities of Shift Supervisors and other non-management associates.
- Assigns work responsibilities, prepares schedules, and ensures that all shifts are covered.
- Prepares daily orders, ensures units are stocked with appropriate levels of product and coaches Shift Supervisors on order procedures.
- Conducts and coordinates on-the-job training for associates, and ensures all associates receive basic skills training to perform their jobs.
- Resolves routine questions and problems and refers more complex issues to higher levels.
- Provides recommendations for hiring, firing, advancement, promotion, or any other status change of associates within the store.

(Doc. 38-4, DEF 002118).

Indeed, job duties vary significantly both depending on the location and the amount of independence a local store manager gives to ASMs.  At shopping mall locations, for instance, ASMs have to more carefully plan how they order and stock products because their customer volume is lower than airport stores.  (Shetron Dec. ¶¶ 16, 24.)[2]  Additionally, some Store Managers are more active in the day-to-day operations of their stores, affecting the daily job duties of the ASMs who work with them.

For example, deposed opt-in Michele Simpson worked for a hands-on Store Manager at a Las Vegas Airport Starbucks.  (Simpson Dep. 62; Goode Dec. ¶ 8.)[3]  Thus, Simpson was less involved in hiring, interviewing or scheduling. (Simpson Dep. 74; Goode Dec. ¶ 5.)  Meanwhile, Luis Colondres Valentin was an ASM at the Orlando airport responsible for managing a Burger King who complained that his boss was a micromanager who contradicted all of his decisions so that he ultimately could not manage his staff.  (Colondres Dep. 124, 149, 167-68).  By contrast, ASM Bradley Rapp did not even have a Store Manager at the Concord Mills Mall Chili's. Instead, his General Manager treated him as the *de facto* Store Manager, giving Rapp full authority over the entire store operations.  (Rapp Dep. 89-90, 106; Shetron Dec. ¶ 12.)  And at the Dallas airport, ASM Mark Benedetto had full authority to interview, hire, and terminate associates who worked under him at a Chili's restaurant.  (Benedetto Dec. ¶¶ 8(a), (f), (g). attached as Exhibit D)

---

[2] Declarations for certain managers are attached as follows: Brian Shetron, Exhibit E; Shadra Goode, Exhibit F; Robert Dollar, Exhibit G; Mario Rostran, Exhibit H; Brian Dedman, Exhibit I; Gregory Smith, Exhibit J; Pasquale Bartolomeo, Exhibit K.

[3] Deposition transcripts for deposed ASMs are attached as follows: Easton Stevens, Exhibit L; Michele Simpson, Exhibit M; Luis Colondres Valentin, Exhibit N; Bradley Rapp, Exhibit O; Joseph Pantanella, Exhibit P; Cynthia Mousie, Exhibit Q; Frank Crump, Exhibit R; Sharon LaGamba, Exhibit S; Robert Vranek Jr., Exhibit T; Ryan Jensen, Exhibit U; Ira Stone, Exhibit V; Anthony Bonacasa, Exhibit W; Pierre Baker, Exhibit X; Rosa Lorusso, Exhibit Y; Martine Dimanche, Exhibit Z; Amanda Siebenaler, Exhibit AA; Vickie Willingham, Exhibit BB; Joseph Walls, Exhibit CC.

Additionally, the opt-in ASMs presented a spectrum of testimony and evidence regarding how they managed their stores and the duties they primarily performed as managers. Some ASMs, for instance, handled disciplining associates on their own (*E.g.,* Benedetto Dec. ¶ 8(g)), while others relied on a human resources department (Pantanella Dep. 31-32, 51). Some ASMs scrutinized sales reports, (Mousie Dep. 53-54), while others had no such routine (Crump Dep. 47:5-16). Some ASMs were the *de facto* Store Manager for their concepts, (Rapp Dep. 106), while other ASMs deferred to their Store Managers to set the management agenda, (LaGamba Dep. 66-68). These differences—culled during months of discovery since this Court granted conditional certification, and which will be addressed in more detail below—require that the conditionally certified class be decertified.

## B.   PROCEDURAL HISTORY

This Court conditionally certified this case on June 15, 2012 (Doc. 49), relying explicitly on and applying the "low standard" employed by courts at the conditional certification stage. (Doc. 49 at 3-4.)

### i.   The Class Generated Limited Participation By Potential Opt-Ins.

Following conditional certification, 275 ASMs opted in from a potential class of approximately 1,700. The notice sent to the potential opt-ins claimed it was being sent by a "settlement administrator," and many of those 275 may have believed erroneously that settlement funds were immediately forthcoming. (*See, e.g.*, Doc. 63-1.)

Even with less than 20 percent of the putative class members participating, the parties followed a procedure where each would identify but eight members to be subjects of discovery.[4]

---

[4] While Host believed, and continues to believe, that each of the opt-in's claims must be evaluated individually, a sampling at this stage of the case was largely dictated by this Court's opinions in *Jankowski v. Castaldi*, 01CV0164(SJF)(KAM), 2006 WL 118973 (E.D.N.Y. Jan.

Despite what plaintiffs described as "diligent" efforts (Ex. DD, March 7 Email from Palitz to Mersol), it took them nearly *three months* to find even eight class members who said they would participate in discovery.  *See* Ex. EE, (May 16th Emails from Palitz to Mersol).  Even then, as explained below, plaintiffs were forced to rely on a group made up entirely of ex-employees who had been terminated by the company.

Of the opt-ins chosen by Host, five opted out of the case rather than participate further (Doc. 123, 124, 127, 133, 140) and an additional three simply refused to respond to further requests from their attorneys or to take any steps to protect their claims—requiring Host to identify replacement deponents.  In other words, this is not a case with a large portion of eager and engaged potential class members.

### ii.        The Deposition Pool Is Skewed.

The eight opt-ins plaintiffs chose to be deposed were not just employees terminated by the company.  In the majority of cases, they were terminated either for poor management skills or for managerial misconduct.[5]   While plaintiffs' selection of poor performers and other

---

13, 2006), *Morangelli v. Chemed Corp.*, 10 CIV 00876, 2011 WL 7475 (E.D.N.Y. Jan. 1, 2011) and *Higueros v. New York State Catholic Health Plan, Inc*., CV07-418ADSETB, 2009 WL 3463765 (E.D.N.Y. Oct. 21, 2009).  As this motion reflects, the case cannot, under any standard, be tried by representative sampling. *See infra* Section III*; see also*, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011); *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013).

[5] By way of explanation, four of plaintiffs' selections were discharged for performance or disciplinary reasons: Sharon LaGamba was discharged because of poor performance (LaGamba Dep. 135); Anthony Bonacasa was terminated for performance issues (Bartolomeo Dec. ¶ 30); Michele Simpson was terminated for failure to carry out job duties (Goode Dec. ¶ 21); Vickie Willingham was terminated after being absent without properly calling off (Willingham Dep. 204).  Likewise, Joseph Pantanella was discharged after he exhausted all of his available leave following knee surgery (Pantanella Dep. 66-67); and Pierre Baker resigned because he felt he was not "effective" working for the company (Baker Dep. 186).  Only one of plaintiffs' selections, Rosa LoRusso, resigned because she was moving to a new state (LoRusso Dep. 193).

malcontent ex-employees for testimony is not surprising in a collective action, defendants' attempts to create a balanced class were repeatedly impeded.

Host initially selected a mixture of four current and four former employees for its eight deponents.  More than half of Host's selections, however, either withdrew from the lawsuit or simply refused to cooperate.  In fact, of Host's initial eight selections, only two presented themselves for deposition, and a third submitted a declaration that will be used in lieu of his testimony.  Likewise, many of Host's replacement selections either withdrew, or simply refused to be deposed.

As a result of opt-ins refusing to participate or withdrawing from the lawsuit rather be deposed, Host was able to gather testimony from only seven of the permitted eight individuals.  Of those seven, five were current employees at the time of their deposition and were the only current employees of the fifteen selections.  In other words, the sample group, through no fault of Host, consists largely of disgruntled former employees – many whom ironically were terminated because they failed to properly perform the exempt duties that were expected of them which are the subject of this lawsuit – eager to present one-sided testimony in plaintiffs' favor.  Even with such a skewed pool, however, the evidence in this matter still supports Host's position as to both decertification and the merits of the ASMs overtime claim.[6]

## III.     ARGUMENT

### THE CONDITIONAL CLASS SHOULD BE DECERTIFIED BECAUSE THE ASMS CANNOT SHOW THAT THEY ARE SIMILARLY SITUATED.

The FLSA permits actions by "any one or more employees for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).   The standards for

---

[6] These 14 opt-in depositions, combined with the depositions of named plaintiff Easton Stevens, as well as the other early opt-ins Amanda Siebenaler, Robert Vranek, Luis Colondres Valentin, and Michael Miosek, bring the total number of plaintiff and opt-in depositions to 19.

section 216(b) collective certification and Rule 23 class certification are the same for the purpose of determining whether an action can proceed on a collective basis—the only issue at this stage in this lawsuit. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) (affirming decertification of Rule 23 class action of state law claims and collective action of FLSA claims). *Gardner v. W. Beef Properties, Inc.*, 07-CV-2345 NGG JMA, 2013 WL 1629299, *6 (E.D.N.Y. Mar. 25, 2013) ("The more opt-ins there are in the class, the more the analysis under § 216(b) will mirror the analysis under Rule 23."). Indeed, "despite the difference between a collective action and a class action and the absence from the collective action section of the Fair Labor Standards Act of the kind of detailed procedural provisions found in Rule 23, there isn't a good reason to have different standards for the certification of the two types of action, and the case law has largely merged the standards, though with some terminological differences." *Espenscheid, 705 F.3d at 772.*

Courts in the Second Circuit employ a two-stage process for determining whether a collective action can be maintained. *See Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010). At both stages, the Court must determine whether plaintiffs are "similarly situated" within the meaning of § 216(b). *Id.* This Court ruled that the plaintiffs met the minimal burden required at the first stage. (Doc. 49 at 3-4) (applying "modest factual showing" standard of review).

The second stage of the two-part certification process, however, is more rigorous. *Myers*, 624 F.3d at 555. With the benefit of discovery at this decertification—or "final certification"— stage, plaintiffs and opt-ins bear the burden to prove in fact that they are "similarly situated." *Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527, 537 (3d Cir. 2012). Few cases survive this level of scrutiny. *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001) (noting that

"no representative class has ever survived the second stage of review"); M*ooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995) (same).

The fact that ASMs share a similar job title does not satisfy this burden. "Being similarly situated does not mean simply sharing a common status . . . . Rather, it means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA." *Id*. at 538. At the second stage, courts assess whether opt-ins are similarly situated by analyzing "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations that counsel for or against maintaining a collective action." *Gardner,* 2013 WL 1629299, at *4.

Further, the "efficiency gains" of collective treatment under § 216(b) "cannot come at the expense of a defendant's ability to prove a statutory defense without raising concerns about due process." *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587 (E.D. La. 2008). Because of this, in misclassification cases, "even where the plaintiffs identify a company policy or practice, variations among the opt-ins may still warrant decertification." *Gardner*, 2013 WL 1629299 at *4. Ultimately, the "more dissimilar plaintiffs' job experiences are from one another and the more individuated an employers' defense are, the less appropriate the matter for collective treatment." *Big Lots*, 561 F. Supp. 2d at 574.

Those "serious concerns about due process" manifest when opt-ins vary so much that "plaintiffs cannot reasonably be said to be representative of each other." *Big Lots*, 561 F. Supp. 2d at 587. In the absence of a truly representative class, the "efficiency gained by holding one trial as opposed to many cannot be obtained at the expense of [a defendant's] due process rights." *Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1241 (N.D. Ala. 2012). The

allure of "trial by formula" simply does not permit a class to be "certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims." *See Dukes*, 131 S. Ct. at 2561.

**A.   DECERTIFICATION IS APPROPRIATE WHEN THE OPT-INS ARE NOT SIMILARLY SITUATED WITH RESPECT TO AN ANALYSIS OF THEIR EXEMPT STATUS UNDER THE FLSA.**

When determining whether opt-ins are similarly situated, "the Court must consider the salient factors in an exemption analysis." *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1094 (D. Kan. 2012).  Under the FLSA, employers do not have to pay overtime if the employee is "employed in a bona fide executive, administrative, or professional capacity." *See* 29 U.S.C. § 213(a)(1).  Thus, certification is appropriate only if opt-ins are similarly situated with respect to their exempt status as determined by the FLSA.

Since the class of ASMs was conditionally certified June 15, 2012 (Doc. 49), the evidence gathered confirms they are fundamentally dissimilar. The factual and employment settings vary widely and are unique to each ASM; Host intends to present individualized defenses based on the discrete facts accompanying each ASMs claims; and certifying such a heterogeneous class would be fundamentally unfair, denying due process protections to Host and non-testifying class members.

The evidence in this case thus reflects a class with rampant distinctions pertaining to ASMs' exempt status, preventing class-wide determinations of liability and damages. Decertification is necessary.

**i.   The Wide Range Of ASM Duties Confirms That Decertification Is Appropriate.**

The ASMs are not similarly situated because, based upon their testimony, they did not perform remotely similarly job duties that influence whether they are exempt.

10

The "analysis of the exemption/misclassification issue is highly fact-intensive." *Big Lots*, 561 F.Supp. 2d at 574.   Where the bulk of the evidence reveals vast disparity among assistant managers, decertification should follow.  *See Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D. N.J. 2000) ("certification as a collective action [was] inappropriate" because there were "many specific dissimilarities between the job duties of the named plaintiffs and the opt-in plaintiffs."). To justify collective adjudication, opt-ins do not have to be identical; but they must present sufficient similarities to permit a jury to make determinations as to liability and damages in one fell swoop.   "Otherwise it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007).

Even within the pool of deponents skewed toward the weakest performers by designated opt-ins refusing to participate, substantial differences among the members are readily apparent based upon their own admissions.  A review of these individuals' testimony reveals a hodge-podge of individuals who: (1)  indisputably performed exempt work; (2) purportedly performed exempt duties sometimes but not others; (3) denied doing exempt work themselves but conceded that other assistant managers did; and (4) conceded they should have been performing exempt duties more often but fell short of expectations.[7]

Opt-in Mark Benedetto, for example, a Dallas ASM, conceded that he regularly performed exempt work.  In fact, Benedetto confirmed that he "interview[s] and hire[s] new associates," that he "can terminate an hourly associate on the spot" for violating company policy, that he orders supplies and inventory, that he spends a large portion of his time directing and

---

[7] A chart illustrating the disparity among the opt-ins, their job duties, and their managerial discretion is attached as Appendix A.

assigning work, and that he monitors and reviews sales trends.  (Benedetto Dec. ¶¶ 8(d), (f), (g), (h), (i)).

In a separate lawsuit involving a class member who did not opt into this case, Jean Dorvil, the court actually granted summary judgment in favor of Host, finding that a former ASM at the Miami International Airport was exempt as a matter of law. *See Dorvil v. Host Int'l, Inc.*, 12-23293-CIV (S.D. Fla. Mar. 6, 2013) (attached as Exhibit II). According to the court, Dorvil was exempt because "his managerial duties of delegating assignments to associates, handling of the cash deposits, product review and ordering, scheduling, and overall supervision of his employees . . . were of significant importance to the operation of the units." *Id.*, slip op. at 7.

The plaintiffs either withdrawing from or refusing to participate in discovery, too, conceded to having managed their workforces.  For instance opt-in Pedro Fuentes, an ASM working at the Goose Island restaurant in Chicago's O'Hare Airport wrote in his 2010 self-evaluation that "I let my staff know on a regular basis what is expected from them" and that he "create[s] schedules that maximizes those businesses [sic] potential to create the most revenue while incurring the least loss."  (Ex. FF at DEF010784-DEF010785; Issa Dec., Ex. KK.)

By contrast, other ASMs testified that they performed their job duties with little managerial authority.  Opt-in Sharon LaGamba only worked for Host for a 3-month period at a Pennsylvania turnpike facility before being terminated for poor management performance. (LaGamba Dep. 38, 114-16.)  She denied performing management work during her short tenure, but readily agreed that other ASMs did.  (*Id.* at 54-55.) Plaintiff Easton Stevens testified that he was too busy doing hourly work to manage his quick-service restaurants at JFK Airport and any

self-evaluation comments he made suggesting otherwise were just an effort to "market myself". (Stevens Dep. 82, 209.)

The ASM testimony thus illustrates broad differences with respect to job duty and managerial discretion from ASM to ASM. These are the types of differences that strongly disfavor collective adjudication. *See Gardner*, 2013 WL 1629299 at *7, 11 (decertification required where testimony revealed differences among opt-ins regarding primary duties and hiring and firing authority); *Big Lots*, 561 F. Supp. 2d at 587 (differences in job duties, work experiences, and managerial discretion among opt-in assistant store managers made decertification necessary); *Knott*, 897 F. Supp. 2d at 1240 (variance among opt-in job duties with respect to primary duties and authority to make personnel decisions required decertification).

In fact, the *Big Lots* court decertified its class of assistant managers for the <u>same</u> reasons that exist here. In that case, the opt-ins' deposition testimony "revealed significant differences in the amount of discretion they possessed to make managerial decision or to delegate tasks to hourly employees." *Big Lots*, 561 F. Supp. 2d at 583. Some *Big Lots* ASMs, for instance, delegated responsibility to subordinates, while "others admitted that their managers critiqued them for *not delegating enough* or not following through on supervision." *Id.* Some acted as the manager on duty when they worked and "had authority to make decisions about how to handle immediately whatever problems arose." *Id.* at 583. Others acknowledged performing concurrent exempt and non-exempt duties. And others had "little or no managerial responsibilities." *Id; see also Gardner*, 2013 WL 1629299 at *8 (noting widely dissimilar job duties among assistant department managers when "for some opt-ins, overseeing the work of other clerks in their department appears to be their defining responsibility . . . while for others, the actual supervising of others seems to be a periodic or incidental component of their job").

Just as the *Big Lots* evidence displayed "widespread differences in the extent to which [ASMs] perform[ed] exempt management duties," the evidence gathered here since the class was conditionally certified shows a heterogeneous class of ASMs.

In this case, ASMs such as Bradley Rapp, Ira Stone, Mark Benedetto, and Ryan Jensen displayed high levels of managerial discretion.

- **Rapp** conceded that he acted as the store manager during much of the class period and that he ran the Concord Mills Mall Chili's "with no store manager there and having no one there . . . telling me what to do." (Rapp Dep. 96:4-8.) Rapp would have given himself high marks for his management performance at a shopping mall near Charlotte, North Carolina. (*Id.* at 65-71.) Rapp was ultimately terminated after he sent inappropriate text messages about a female subordinate he wanted to terminate for poor performance. (*Id.* at 129-35.)

- **Jensen** was in charge of the front of the house of a Dallas airport Chili's, (Jensen Dep. 42-43, 58).

- **Stone** was the sole assistant manager in charge of operations at multiple quick-service restaurants at a Florida airport. (Rostran Dec. ¶ 9.) What's more, Stone's store manager, Mario Rostran, told Stone "that he was responsible for whatever happened in those units, whether related to personnel, sales, or operations because he was the manager in charge." (Rostran Dec. ¶ 9.)

- **Benedetto** declared that he "oversee[s] the day-to-day work of approximately 85 hourly associates" and is in charge "mainly of hiring, training, inventory, following the budget, and making decisions to ensure that we are achieving our store goals." (Benedetto Decl. ¶¶ 7(c), 8(a).)

By contrast, Anthony Bonacasa and Frank Crump purportedly maintained relatively little managerial discretion in their jobs as ASMs at New York's JFK Airport (Bonacasa) and Phoenix Sky Harbor Airport (Crump) where they each managed multiple quick-service locations.

- **Bonacasa** could not interview, hire, fire, or make final disciplinary decisions. Although he could move associates from unit to unit during a shift, he did not have authority to set the master schedule. (Bonacasa Dep. 54, 71.)

- **Crump** could replace employees who did not show up for their shifts with other associates, but he had no control over scheduling generally." (Crump Dep. 49.) If he saw an employee violating store rules, Crump had to notify his store manager rather than deal with the situation unilaterally. (*Id.* at 51.)

Other opt-ins (e.g., Cynthia Mousie and Pierre Baker) testified that their exercise of managerial discretion fell somewhere between Crump and Bonacasa on the one hand, and Rapp, Jensen, Benedetto and Stone on the other.

- **Mousie** was an assistant manager over several store units and managed unionized hourly employees.  Under the local union rules, employees had the freedom to choose their own shifts.  So Mousie could assign work responsibilities to employees, but she could not move an employee from one work location to another during a shift without the employee's consent.  (Mousie Dep. 97.) Mousie did, however, possess authority to make discipline decisions, including termination calls, without seeking prior approval from her store manager. Dedman Dec. ¶ 19.

- **Pierre Bake**r exercised a different kind of managerial authority as an ASM of a Chili's Too at the Atlanta airport.  There, he worked under a store manager who was only present in the store three or four times per week because the store manager also oversaw another restaurant and had an office in a different concourse. (Baker Dep. 75, 88.)  Thus, Baker was often the senior management in the store, giving him freedom to run the store and make decisions such as writing corrective actions for employees who acted contrary to company policy.  (*Id.* at 59, 164.)  However, Baker testified that many of his decisions regarding personnel and ordering required final approval from his store manager.  (*Id.* at 104-05, 125.)

And in Las Vegas, opt-in ASM Michele Simpson admitted—just like some *Big Lots* ASMs—that she should have exercised more discretion but instead sought final approval from her store manager too often:

- **Simpson** testified that her store manager wanted her to "make decisions more often" and "take more initiative in replacing shifts." (Simpson Dep. 74:17-22.) Her store manager confirmed as much, writing in a 2010 corrective action regarding Simpson that "[y]ou get paid as an assistant manager and I expect you to take some initiative to resolve issues, make decisions and manage the business accordingly."  (*Id.* at 74:2-5, Dep. Exhibit 16.)  Eventually, Simpson was terminated "because it was apparent that she could not consistently carry out her Assistant Manager job duties." (Goode Dec. ¶ 21.)

Apart from the individualized differences among the various ASMs occasioned by their management, the difference between managing a union versus a non-union facility affects the extent of managerial authority permitted to an ASM.  Some of the opt-ins worked at union

facilities, while others did not. *Compare* (Pantenella Dep. 10:10-11, Crump Dep. 24:16,  and Mousie Dep. 97) (confirming union presence for hourly workers at Detroit, Phoenix and Cincinnati Airports) *with* (Willingham Dep. 57:3-5, Jensen Dep. 78:3-7; and Walls Dep. 84:17-18) (confirmation of no union presence at Jacksonville Airport, Dallas-Fort Worth Airport, and Ohio Travel Plaza).   The union contracts, predictably, generally prohibited supervisors and managers from doing bargaining unit work.  (E.g., Pantanella Dep. 15-17.)  In fact, opt-in Robert Vranek, Jr., who briefly worked as an ASM II at the Milwaukee Mitchell Airport from August 2008 to February 2009 (Vranek Dep. 37), testified that the union (not Host) managed the Milwaukee Airport units. (Vranek Dep. 55-57). While the Milwaukee collective bargaining agreement specifically prohibited Vranek from performing hourly associate duties, he contended that the union required him to perform hourly work, and eventually caused his discharge to preserve union jobs. (Vranek Dep. 78).

Despite this routine prohibition, some of the target opt-ins contended that the union sat idly by while they performed the work of hourly associates, an improbable circumstance that may ultimately require a union-by-union, location-by-location, and individual-by-individual inquiry.  (Pantanella Dep. 15-17; Crump Dep. 50:17-24.)

These examples demonstrate that the scope of ASM managerial authority cannot be determined class-wide or based on allegedly representative evidence.  The authority exercised by one ASM in a Chili's at a mall in North Carolina is not reflective of an ASM at a Starbucks in the Las Vegas airport or an ASM who manages several fast-food restaurants at JFK airport. *Reyes v. Texas EZPawn L.P.*, 2007 WL 1010808, *5 (N.D. Tex. Jan. 8, 2007) (noting that class treatment is "particularly unsuitable" when "the degree of discretion and authority each ASM exercised varied depending on store management and store demographics").

16

### a.    The Opt-In Deponents' Prolific Credibility Issues Mandate Individualized Inquiry.

Many of the opt-in plaintiffs attempted to downplay their management roles, but were belied by years of their own statements in performance evaluations and post-termination documents that they had extensively performed management duties for Host.  Some, such as Bradley Rapp, suggested what they described as embellishments.  Others, such as Joseph Pantanella, attributed their own statements to having to "lie when I have to."  (Pantenella Dep. 71.)

Collective treatment of an action is "unmanageable" when "evidence exists calling into question the credibility of Plaintiffs' claims, including Plaintiffs' own resumes touting their management responsibilities as well as their contradictory testimony."  *Harbor Freight Tools, USA, Inc.*, 888 F. Supp. 2d at 1103-04.  The deposition testimony of several opt-ins indicates that individual credibility determinations must be made to assess the veracity of their statements disputing their managerial independence, including hiring and firing authority.

For instance, Vickie Willingham, an ASM at a Sbarro's at the Jacksonville, Florida airport, testified that her self-evaluation and resume statements that she hired a lot of hourly associates were untruthful.  Willingham Dep. 108, 136-37.  In addition to Willingham, Host intends to explore the credibility of numerous other deponents who testified that they were untruthful in their self-evaluation reports on the issue of managerial discretion:

- **Rosa Lorusso** admitted during her employment that she managed extensively, but then testified at her deposition that she embellished her authority on her self-evaluations to get a raise.  (Lorusso Dep. 163.)  However, her store manager, Robert Dollar, confirmed that in fact she did perform primarily exempt duties and that he rarely saw Lorusso doing the work of hourly associates.  (Dollar Dec. ¶ 19);

- **Cynthia Mousie** testified at one point that she had no hiring authority and later in the same deposition acknowledged that she hired associates.  (Mousie Dep. 95-96, 107.)  Mousie's manager further confirmed that her testimony that she had limited hiring

authority was false. In fact, she had broad, exclusive discretion to make hiring and firing decisions. (Dedman Dec. ¶¶ 11-13, 19);

- **Ryan Jensen** testified that he misrepresented his managerial authority so he could "make more money." (Jensen Dep. 19-20.) But Jensen's testimony that he had limited hiring and firing authority was false, according to his store manager who declared that Jensen had broad discretion to make hiring and firing decisions. (Smith Dec. ¶¶ 12, 17);

- **Ira Stone** testified that he was not in charge of his stores at a Florida airport and could not make hiring decisions. (Stone Dep. 138:7-8.) His store manager, however, declared that Stone had ultimately authority to run his stores, including full discretion to make hiring and firing decisions. (Rostran Dec. ¶¶ 9-13.) In fact, Rostran said the only way for an associate to be hired at one of Stone's stores would be for Stone to make the hire on his own. (*Id.* ¶ 13);

- **Martine Dimanche** testified that her self-evaluation statements about hiring and firing were untrue because she was falsely inflating her profile to get a raise. (Dimanche Dep. 147, 164);

- **Joseph Pantenella** testified that "I lie when I had to" to make more money. "That's how I make my living. That's exactly how I would make my money." (Pantenella Dep. 71.) Pantenella's capacity for lying to receive incentives, thus, raises substantial credibility issues with respect to his testimony that he neither fires nor hires associates. (*See id.* at 53-54);

- **Bradley Rapp** testified that at one point he spent about 80 percent of his time performing non-exempt hourly duties cooking food, cleaning dishes, running the cash register, and taking out the trash. (Rapp Dep. 146:6-147:20.) However, his general manager confirmed that when Rapp was the acting Store Manager, he was solely responsible for the day-to-day operations and performance of the unit." (Shetron Dec. ¶ 13.) "Although an Assistant Manager might occasionally help bus a table or cash out a customer, Rapp rarely performed these duties." (*Id.* ¶ 28.) "Contrary to his deposition testimony . . . such (non-exempt) work amounted to less than five percent of Rapp's overall time at work." (*Id.* ¶ 29.) Moreover, Rapp's manager confirmed that Rapp falsely testified that he was not accountable for the performance of his Chili's store. *Compare* (Rapp Dep. 51:5-6) ("I wasn't held accountable for the performance of the unit.") *with* (Shetron Dec. ¶ 13) ("Rapp's deposition testimony that he was not held accountable for the day-to-day operations and performance of the unit is false.");

- **Michele Simpson** testified that she spent about 90 percent of her time performing non-exempt hourly duties preparing drinks, cleaning dishes, stocking supplies, and taking out the trash. (Simpson Dep. 86:8-87:2.) However, her store manager confirmed that Simpson "customarily and regularly directed the work of several other employees." (Goode Dec. ¶ 5.) "Simpson was in charge of running shifts when she worked," and she "was not expected to do the work of hourly associates." (*Id.* ¶ 11, 18);

- **Anthony Bonacasa** testified that he performed non-exempt hourly associate work 75 percent of the time. (Bonacasa Dep. 245:21-25.) But his store manager disagreed, stating Bonacasa's primary duties consisted of management of one or more JFK store units, and that Bonacasa managed and directed the workforce. (Bartolomeo Dec. ¶¶ 5, 14.) "He was not expected to do the work of hourly associates and he rarely did so." (*Id.* ¶ 14);

- **Amanda Siebenaler** testified that she not only embellished in her self-evaluation statements regarding her managerial duties but that she was "[n]ot really" truthful when making her assertions. (Siebenaler Dep. 43.)

This conflicting testimony above is a sample of the individualized credibility determinations that must be made in this case—and which Host intends to pursue ASM by ASM. Moreover, the *Dorvil* case further highlights credibility issues with individual opt-ins who claim to be non-managerial because Dorvil testified that as an ASM "even while preforming nonexempt manual tasks, he continued to supervise employees." *Dorvil*, slip op. at 8. Separate actions, rather than a collective action, present the more appropriate adjudicatory path when the efficiency of aggregate litigation is undermined by the individual issues that predominate here. *See Harbor Freight Tools, USA, Inc.*, 888 F. Supp. 2d at 1103-04. (decertifying class because "the individualized defenses for each opt-in Plaintiff weighs against continued certification.").

### ii. The Opt-Ins Possess Varying Hiring And Firing Authority.

Courts routinely decertify classes when the alleged disparity over hiring and firing authority is as wide as it is here. In *Gardner*, a court in this district decertified a class of grocery store assistant department managers and department managers because their authority to making hiring and firing decisions and recommendations "varie[d] widely." *Gardner*, 2013 WL 1629299 at *11-12. That unbounded, heterogeneous class featured both opt-ins who made hiring and firing decisions and opt-ins who had "no involvement" in related decisions, including personnel evaluations. *Id.*

Likewise, the Northern District of Alabama decertified a class of retail store managers because their "authority to hire employees varied" in that "[s]ome hired associates unilaterally, while others simply made recommendations" and others "neither hired associates nor made recommendations." *Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1239 (N.D. Ala. 2012); *see also Big Lots*, 561 F. Supp. 2d at 582 (decertifying class of assistant store managers of retail store when only "about half . . . report that they regularly hire subordinates or influence hiring decisions and the other half do not"); *Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d at 1104 (decertifying class of store managers because it was "not possible to develop common testimony . . . regarding their daily responsibilities and job duties, or the weight given their recommendations regarding hiring, firing and discipline"); *Reyes*, 2007 WL 101808 at *3 (decertifying class of assistant store managers because "[s]ome took absolutely no role in hiring, while others interviewed prospective employees and made recommendations on hiring.").

The class of ASMs here reflects those same characteristics that require decertification. Class resolution of this critical issue is not possible.  *See Big Lots*, 561 F. Supp. 2d at 586 ("[u]sing representative proof is problematic if for every instance in which an opt-in plaintiff reported that she hired subordinates, there is an alternative response to the contrary.")

Consider Bradley Rapp and Frank Crump.  Rapp was an ASM who acted as the *de facto* store manager of a Chili's restaurant at a shopping mall in North Carolina.  He noted in a self-evaluation that he "ha[s] been solely responsible for the staffing of our unit," (Rapp Dep. Ex. 19), and he confirmed in his deposition that he made decisions on which employees to hire after a pre-screening process by Host's human resources department. (*Id.* at 113:6-21.)  And because he worked without a store manager above him for much of the class period, Rapp's hiring and

firing decisions regarding non-manager employees were not subject to review. (Shetron Dec. ¶ 18.)

Crump, meanwhile, claimed that he had no authority to make hiring or firing decisions regarding associates.  At the Phoenix Sky Harbor Airport, Crump was one of three assistant managers who helped a store manager run several franchises, including Dick Clark's, Chili's, Desert Springs, Jody Maroni's, Pizza Hut, and Burger King.  (Crump Dep. 10, 24.) Crump claims he never hired an employee during his time as an ASM; he never even conducted an interview or recommended an employee for a promotion or a demotion.  (*Id.* at 47, 56.)

The gulf of authority between Rapp's hiring and firing discretion and Crump's is reflective of the wide disparity that prevents a single conclusion for the 269 opt-ins.

| | |
|---|---|
| **Substantial hiring and firing authority** | Brad Rapp, (Rapp Dep. 110:24-111:2, 113:10-21); Ryan Jensen, (Jensen Dep. 58); Cynthia Mousie, (Mousie Dep. 107; Dedman Dec. ¶¶ 11-13, 19); Ira Stone, (Rostran Dec. ¶13); Mark Benedetto, (Benedetto Dec. ¶ 8(g)). |
| **Some hiring and/or firing authority/weighted recommendation** | Martine Dimanche, (Dimanche Dep. 54:8-25, 55:1-22, 73-78); Michelle Simpson, (Goode Dec. ¶ 5.) |
| **Occasional hiring and/or firing recommendation** | Rosa Lorusso, (Lorusso Dep. 134); Anthony Bonacasa;  (Bonacasa  Dep.  71);  Joseph Pantanella,  (Pantanella  Dep.  53-54,  65); Joseph Walls, (Walls Dep. 53) |
| **No role in the hiring or firing process** | Frank Crump, (Crump Dep. 47, 55-56); Pierre Baker, (Baker Dep. 51, 64); Sharon LaGamba, (LaGamba Dep. 71:10-24.) |
| **Unclear/contradictory testimony** | Vickie Willingham, (Willingham Dep. 136-37.) |

Without anything resembling uniformity among the class members testimony regarding hiring and firing, the Court can only analyze such duty on a case-by-case basis.

### iii.   The Opt-Ins Possess A Wide Variance Of Interviewing Authority.

Similar to the variation in hiring authority, ASMs particularly diverge on their authority to conduct interviews of associates under consideration for being hired.[8]

Vickie Willingham could conduct interviews, for instance, but she recalled doing only one interview during her time as ASM of Big Apple Bagel. (Willingham Dep. 42-44.)  By contrast, Ryan Jensen confirmed that he regularly interviewed applicants at the Dallas Forth-Worth Chili's as part of his efforts to help with staff recruiting.  (Jensen Dep. 28-29.)  Likewise, Mark Benedetto worked with the human resources department in Dallas to determine the best candidates to interview and then unilaterally made hiring decisions.  (Benedetto Dec. ¶ 8(f)).  But at the Detroit Airport Chili's, Joseph Pantanella never conducted interviews because local human resources personnel at the Detroit Airport conducted all interviewing and regarding hiring and promotions.  (Pantanella Dep. 63.)

There is simply no way to resolve in a single class-wide analysis whether the ASMs had authority to interview when the evidence reveals that their authority ranged from none to substantial:

| | |
|---|---|
| **Substantial authority to interview** | Michele Simpson, (Simpson Dep. 82, 85); Bradley Rapp, (Rapp Dep. 106-107; 113:6-9); Ryan Jensen, (Jensen Dep. 28-29); Ira Stone, |

---

[8] The Department of Labor lists "interviewing" as a job duty that indicates exempt status.  29 C.F.R. § 541.102.

| | |
|---|---|
| | (Stone Dep. 97:17-20); Martine Dimanche, (Dimanche Dep. 54, 145, 165-166); Joseph Walls, (Walls Dep. 53); Mark Benedetto, (Benedetto Dec. ¶ 8(f)). |
| **Occasional authority to interview** | Vickie Willingham, (Willingham Dep. 42-43); Cynthia Mousie, (Mousie Dep. 96-97, 114.) |
| **No authority to interview** | Rosa Lorusso, (Lorusso Dep. 45); Frank Crump, (Crump Dep. 47); Anthony Bonacasa, (Bonacasa Dep. 54); Pierre Baker, (Baker Dep. 51); Joseph Pantanella, (Pantanella Dep. 63); Sharon LaGamba, (LaGamba Dep. 67:19-24). |

### iv.      ASMs Maintain Divergent Authority With Respect To Discipline.

The ASMs testified that their authority to discipline subordinate associates varies by location, the type of discipline, store manager preference, and ASM initiative.

For instance, the following ASMs confirmed that they maintained authority to discipline associates working for them:

- Michele Simpson, (Simpson Dep. 65:1-14);
- Cynthia Mousie, (Mousie Dep. 46);
- Ryan Jensen, (Jensen Dep. 91-92; 99:13-17; 100:18-23);
- Mark Benedetto, (Benedetto Dec. ¶ 8(g));
- Bradley Rapp, (Rapp Dep. 123).

Other ASMs could discipline associates and then submit the written discipline form to their store manager for approval:

- Rosa Lorusso, (Lorusso Dep. 144);
- Anthony Bonacasa, (Bonacasa Dep. 59);
- Pierre Baker, (Baker Dep. 104-105);
- Martine Dimanche, (Dimanche Dep. 66-67, 70).

Some ASMs could use their discretion to discipline associates but would have to receive prior approval from their local human resources department:

- Vickie Willingham, (Willingham Dep. 70:5-13);

23

- Joseph Pantanella, (Pantanella Dep. 31-32, 51).

By contrast, the following ASMs testified that they could only discipline associates after asking their store managers for permission:

- Frank Crump, (Crump Dep. 51);
- Ira Stone, (Stone Dep. 93:1-94:21);
- Joseph Walls, (Walls Dep. 30-31).

And Sharon LaGamba uniquely testified that she never disciplined any employees. (LaGamba Dep. 67:11-13.)  The varying testimony again confirms that such analysis will result in an individualized inquiry.

### v.    Some Asms Are In Charge Of Scheduling While Others Have No Scheduling Role At All.

Just as with other managerial duties, the ASMs lack cohesiveness with respect to their authority to determine the schedules of employees who work for them.   No class-wide conclusion can be drawn by analyzing any single ASM because their scheduling authority, as demonstrated below, ranged from none to ultimate authority in which at least one ASM was in charge of setting his own schedule:

**Ultimate Scheduling Authority**

| | |
|---|---|
| Bradley Rapp | Rapp not only scheduled his subordinate employees, he also determined *his own* schedule as the acting store manager of the Concord Mills Mall Chili's. (Rapp Dep. 137-138; Shetron Dec. ¶¶ 20-22.) |

**Substantial Scheduling Authority**

| | |
|---|---|
| Ryan Jensen | Jensen agreed with the statement that he "has been running the server schedule" at the Dallas-Fort Worth Chili's where he is an ASM.  (Jensen Dep. 52.) |

24

| | |
|---|---|
| | Q: Who schedules them?<br><br>A: Depending on who's doing the scheduling. If it's a server, I do the server's schedule, and I'll you know –I'll make the schedule who trains.<br><br>(Jensen Dep. 55:6-9.)<br><br>A: I do the scheduling for the front of the house. I do a rough draft manager schedule that is approved by the general manager. (Jensen Dep. 58:5-7.) |
| Martine Dimanche | Dimanche set the schedule for Starbucks associates at her New Jersey turnpike location. (Dimanche Dep. 61:12-15.)  That schedule was subject to store-manager approval.  (*Id.* at 62:6-7.) |
| Ira Stone | Stone did the scheduling for his quick-service stores at a Florida airport.  His scheduling duties included determining the amount of labor necessary based on store budgets and rotating associates into different roles so they would be "cross-trained" and capable of working various assignments.  (Stone Dep. 140-142; Rostran Dec. ¶¶ 11-12.) |
| Mark Benedetto | "I am responsible for scheduling many of the hourly associates. For example, I schedule about a dozen bartenders. To do this, I look at the upcoming budget, I look at our bartending needs, and then I attempt to meet both requirements.  When needed, I will also schedule other positions around the restaurant as well, including the 20 cooks and approximately 50 servers." (Benedetto Dec. ¶ 8(b).) |

### Influential Scheduling Authority

| | |
|---|---|
| Vickie Willingham | Willingham drafted schedules once a week for the three locations where she was an ASM. |

| | |
|---|---|
| | She testified that most of the time, her draft schedules were changed by store managers. (Willingham Dep. 45:1-12.) |
| Cynthia Mousie | Mousie used her managerial authority to determine how many employees would be needed per shift each week at her stores. She then posted the schedule of available shifts, and pursuant to local union rules, employees could choose for themselves the shifts they wanted to work. (Mousie Dep. 26-27, 85, 93.) |
| Pierre Baker | Baker produced an outline schedule once per week. (Baker Dep. 52-53.) |
| Joseph Walls | Walls generally did not set the schedule at his Ohio turnpike location, but occasionally he made schedule suggestions to his store manager that were well received. (Walls Dep. 80, 130.) |
| Amanda Siebenaler | Q: What – how – did you assist with employee scheduling? <br><br> A: What it basically was is you log on to a program and copy and pasted it and posted it. They had set schedules. (Siebenaler Dep. 36:20-24.) |

**No Scheduling Authority**

- Michele Simpson, (Goode Dec. ¶ 9); Frank Crump, (Crump Dep. 47:9-25); Anthony Bonacasa, (Bonacasa Dep. 56); Joseph Pantanella, (Pantanella Dep. 43); Sharon LaGamba, (LaGamba Dep. 68:3-6).

### vi.   ASMs Differ In Their Authority To Conduct Performance Evaluations.

ASM testimony and Store Manager declarations confirm a wide range of duties regarding the ASMs' authority to evaluate the performance of associates who worked under them. Some conducted evaluations without Store Manager input, and the ratings in such reviews were then used to determine associate pay increases:

- **Ryan Jensen** evaluated associates who worked for him, basing their evaluation on their daily performance. (Jensen Dep. 102:20-24.)   Jensen's employee evaluation ratings "factor into the annual wage increases that employees receive." (Smith Dec. ¶ 16);
- **Pierre Baker** evaluated employees on a monthly basis.  (Baker Dep. 57);
- **Joseph Walls** has conducted employee evaluations at his Ohio turnpike store. (Walls Dep. 80);
- **Bradley Rapp** had "full authority to evaluate the performances of his employees." (Shetron Dec. ¶ 27).

Other ASMs received input and assistance from store managers:

- **Martine Dimanche** evaluated employees, focusing mainly on their customer service and assigning numerical ratings.  However, she testified that her Store Manager often changed the ratings. (Dimanche Dep. 79-81);
- **Rosa Lorusso** conducted employee evaluations, but on every evaluation, her store manager would later change the ratings Lorusso assigned.  (Lorusso Dep. 37, 40);
- **Vickie Willingham** signed off on employee evaluations that were primarily conducted by Store Managers and occasionally conducted her own reviews at Sbarros and Big Apple Bagel. (Willingham Dep. 114-115; 145).

And some of them testified to having no role in evaluating employees:

- **Frank Crump** "never evaluated any employees during [his] time at HMSHost." (Crump Dep. 49);
- **Cynthia Mousie** testified that she does not evaluate employees or provide recommendations for advancement.  (Mousie Dep. 97).

Despite all these variances among factors indicating exempt status, plaintiffs seek final certification under the premise that the opt-ins are similarly situated.  Plaintiffs are wrong.  If the ASMs were truly similarly situated, Host would be able to make a broad-based argument in defense of their claims that they are non-exempt.  Instead, because differences exist at every junction of an exemption analysis, Host's only "alternative is to pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each of the plaintiffs to prove that these ASMs are properly classified as exempt.  That exercise is tantamount to conducting multiple individual trials on the merits and is the antithesis of a collective action." *Big Lots*, 561 F. Supp. 2d at 586.

Certification cannot continue where this Court will be mired in endless mini-trials on whether individual ASMs are exempt.

**B.    THE DIVERSE FRANCHISES REQUIRE THAT THE OPT-INS PERFORM DIVERSE JOB DUTIES THAT VARY FROM CONCEPT TO CONCEPT.**

The ASM job duties preclude certification as well because the opt-ins worked at one or more of over 100 different franchises or concepts across the United States. These included chains such as Burger King and Starbucks, where courts in the past have found assistant managers to be exempt as a matter of law. *Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir. 1982); *Donovan v. Burger King Corp.*, 672 F.2d 221, 227 (1st Cir. 1982); *see also Barenboim v. Starbucks Corp.*, 21 N.Y.3d 460 (N.Y. 2013) (noting that coffee shop baristas are managers with meaningful authority when they also "discipline subordinates, assist in performance evaluations or participate in the process of hiring or terminating employees, as well as having input in creation of employee work schedules"); *Matamoros v. Starbucks Corp.*, CIV.A. 08-10772-NMG, 2011 WL 1044654 (D. Mass. Feb. 8, 2011) (Starbucks shift supervisors possess managerial responsibility) *report and recommendation adopted*, CIV.A. 08-10772-NMG, 2011 WL 1002740 (D. Mass. Mar. 18, 2011) *aff'd*, 699 F.3d 129 (1st Cir. 2012).

With respect to even the individual franchises, many courts have concluded that the duties of ASMs are too disparate to justify certification under even that one brand, let alone several. *Zavala*, 691 F.3d at 538; *Big Lots*, 561 F. Supp. 2d at 587; *Gardner*, 2013 WL 1629299 at *7, 11; *Knott*, 897 F. Supp. 2d at 1240; *Reyes*, 2007 WL 101808 at *3; *Aquilino v. Home Depot, U.S.A., Inc.*, CIV.A. 04-04100 PGS, 2011 WL 564039, *9 (D.N.J. Feb. 15, 2011) (decertifying because "the disparate factual and employment settings of Plaintiffs do not weigh in favor of continued certification"). Indeed, the district court in *Dorvil* found a Host ASM to be exempt, meaning that plaintiffs cannot argue that Host ASMs are non-exempt across the board.

28

Thus, the case law explicitly holds that several of the Host franchises employ assistant managers who are performing exempt work.  The plaintiffs cannot maintain a diverse class of employees who work at contextually different locations, some of which are performing exempt work as a matter of law.

Plaintiffs ask the Court to adjudicate a class that includes people working at roadside coffee shops, full-service, sit-down restaurant employees, and quick-service ASMs who oversee several units of varying complexity and service within a single airport.  Such a class-wide analysis is not possible without infringing upon Host's due process rights.

The daily job duties for an ASM at each of those types of locations varies substantially—even more so when locations are isolated based on business volume.  (Lauterbach Dep. II 55:18-25, 74:25-75:3, 121:21-122:5.)   Class-wide exemption conclusions cannot be made by comparing the managerial duties of a Dallas airport Chili's ASM who manages 80 associates—25 to 27 at any given time—(Jensen Dep. 42), with a Jacksonville airport Big Apple Bagel ASM who claims to have managed one associate per shift.  (Willingham Dep. 29; Lauterbach Dep. 55:18-23); *see also Reyes*, 2007 WL 1010808 at *4 (decertifying because "the evidence clearly establishes that ASMs' job duties varied from store to store depending on the management style of their superiors and store demographics.").  Thus, it is not enough to say that these individuals are all a class of "managers."  Their job duties vary significantly when they work with 25 employees as compared to ASMs who manage only a handful of employees at a time.  It is procedurally unfair to certify a class of ASMs who work in different stores, "in different departments of varying sizes, and whose managerial duties differ[] significantly such that they cannot be established through generalized proof."  *Gardner*, 2013 WL 1629299 at *5-6.

29

These contextual differences that disfavor certification manifest throughout the opt-in class. Not only do opt-ins work at different locations for different managers in different-sized departments, but they also work for different brand names with unique store concepts. Opt-in Amanda Siebenaler "r[a]n all unit operations that total $6.4 million+ in annual sales volume," along with assisting with employee scheduling. (Siebenaler Dep. Ex. 1).  And although she claimed at her deposition that she had exaggerated her managerial duties (Siebenaler Dep. 43, 165), she admitted that she supervised approximately 30 employees at six different Minneapolis/St. Paul airport locations at any given time. (*Id.* 35-36). These units included Quizno's, A&W, Itasca, Godfather's Pizza, Varsity, and Skol Cafe & Bar. (*Id.*).

Conversely, Martine Dimanche was one of four ASMs reporting to a store manager at the Woodrow Wilson Travel Plaza on the New Jersey turnpike where she managed just two associates per day, a cashier and prep worker at Starbucks, in addition to her responsibilities for overseeing operations at Roy Rogers, Pizza Hut, Travel Mart, Blimpie's and Nathan's. (Dimanche Dep. 44-46, 49.)

In Florida, Ira Stone managed quick-service restaurants and even worked from home as he managed the Nathan's and Quizno's locations.  (Stone Dep. 123:18-19.)  When he managed Great American Bagel and Starbucks, he spent much of his time moving back and forth between the units, overseeing operations and helping with "hands-on" work.  (*Id.* at 125-126.)  Robert Vranek managed a Burger King, Usinger Deli, Pizza Hut, and Cinnabon in Milwaukee, where he supervised 20 employees. (Vranek Dep. 44, 67.)  Rapp, however, managed just one restaurant, the Concord Mills Mall Chili's, where he managed the entire store, had no store manager and oversaw a staff of 50 to 60 employees.  (Rapp Dep. 43:11-15, 46:16.)

Even among the same brand, management duties differed.  Whereas Rapp oversaw entire-store operations at the North Carolina Chili's, (Rapp Dep. 43:11-15), Jensen managed just the front-of-the-house (non-kitchen) operations at the Dallas-Fort Worth Chili's, (Jensen Dep. 42-43, 58).

Not only did the management settings differ depending on the location, but so did the way in which management duties were carried out.  For instance, an ASM at a mall restaurant, such as Rapp, would order provisions for the store from off-site suppliers with which the ASM would maintain an established working relationship.  (Shetron Dec. ¶ 24.) Additionally, because deliveries of such provisions were made just a few times per week, a mall ASM would be required to carefully calculate in advance how much product would be needed so as to avoid wasting provisions—and ultimately company money.  (*Id.* ¶¶ 16, 24.) This calculation was critical for mall ASMs because their business volume tended to be lower than airport ASMs who could rely on a steady stream of customer traffic and would not need to worry about wasting provisions.  (*Id.*)

Meanwhile, airport ASMs do not have to establish and maintain relationships with outside suppliers.  (*Id.*)  Instead, airport ASMs and Travel Plaza ASMs order provisions from a central commissary.  (*Id.*); (Bartolomeo Dec. ¶12.)  Unlike requirements for mall ASMs, airport ASMs can place commissary orders every day; so the advanced provision planning required of a mall ASM is not as central to the management role of an airport ASM.  (Shetron Dec. ¶¶16, 24.)

The disparity among the ASMs' collective workplaces is vast and thus favors decertification.

## C.   PERMITTING CERTIFICATION WILL PRECLUDE HOST'S INDIVIDUALIZED DEFENSES.

In determining whether a case should be decertified, courts should also examine the defenses available to the defendant, and in this case there are several. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2560-61 (2011) ("A class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims."); *Big Lots*, 561 F. Supp. 2d at 586 (decertifying because "the dissimilarity of plaintiffs' self-reported job duties makes it exceedingly difficult for Big Lots to assert its statutory exemption defense on a collective basis").

The numerous individualized defenses here are apparent and preclude certification. Opt-in Martine Dimanche, for example, filed for bankruptcy after leaving Host, but never listed any wage claim as an asset.  (Dimanche Dep. 22)  She will be judicially estopped from raising any claim in this case.  *Amash v. Home Depot U.S.A., Inc.*, 1:12-CV-837, 2013 WL 6592205 (N.D.N.Y. Dec. 16, 2013) (applying judicial estoppel to dismiss FLSA claims where plaintiff failed to disclose the claims as assets in his bankruptcy proceeding); *Alli v. Boston Market Co.*, 2011 WL 3924246, at *1–2 (D. Conn. Sept.7, 2011) (applying judicial estoppel to bar FLSA claims made by former assistant manager at a Boston Market that were not disclosed in her bankruptcy petition*); see also Coffaro v. Crespo*, 721 F. Supp.2d 141, 145 (E.D.N.Y. 2010) ("In the bankruptcy context, judicial estoppel is commonly invoked in order 'to prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy.'") (quoting *Negron v. Weiss*, 2006 WL 2792769, at *3 (E.D.N.Y. Sept.27, 2006)).  While defendant has not been permitted discovery from all opt-ins, a review of court records reflects that this defense may exist for at least 34 other opt-ins who also filed for bankruptcy.

Host has defenses based upon other types of estoppel that courts recognize under the FLSA. *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972) (Under the FLSA, plaintiff "could not profit from her own wrong in furnishing false data to the employer"); *Joza v. WW JFK LLC*, 2010 WL 3619551 (E.D.N.Y. Sept. 10, 2010) (directing verdict for defendant on FLSA claim for overtime because plaintiff "prevented defendants from learning about her alleged extra overtime work"). Based on what a particular opt-in plaintiff may have advised Host, it may have a defense to a significant portion of their claim, particularly as to the issue of willfulness. Numerous opt-ins, for instance, described themselves as regularly performing exempt, managerial duties in their annual self-evaluations. (*See e.g.,* Jensen 2011 Self-Evaluations, attached as Exhibit GG, DEF223049-223055, Jensen Dep. Ex. 6; Stone 2011 Self-Evaluations, attached as Exhibit HH, DEF22373-222379.) In fact, plaintiffs claim they purposefully embellished or even outright lied on those self-evaluations to get more money from Host. (*See, e.g.,* Willingham Dep. 108, 136-137, Pantenella Dep. 71, Lorusso Dep. 163.) Host took the ASMs at their word that they were performing exempt work and gave them raises accordingly. As part of its due process right to defend against individual claims, Host must be able to determine the veracity of those self-evaluation statements to the extent they are contradicted by testimony. Because this inquiry must be taken on an individualized, fact-intensive basis, it too reflects that the case should be decertified.[9]

---

[9] Host has an additional defense based on the statute of limitations for bringing an FLSA action. The statute of limitations under the FLSA is ordinarily two years. 29 U.S.C. § 255. If the plaintiff proves that the defendant has acted "willfully," the statute of limitations may be extended to three years. *Id.* To establish willfulness, the plaintiff must prove that the defendant acted either with knowledge that its actions violated the FLSA or with reckless disregard for whether its actions were unlawful or not. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-35, 108 S. Ct. 1677 (1988). Plaintiffs, not defendants, bear the burden of proof on this issue. *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009). The reasons explaining

Moreover, defending against an opt-in such as Michele Simpson, who claims she was non-exempt because she did not perform her exempt job duties as instructed by company policy or her manager is the sort defense that "requires individualized evidence, making it difficult . . . to defend all of Plaintiffs' claims with generalized proof." *Reyes*, 2007 WL 1010808 at *5 (decertifying class that included opt-ins who attempted to convert exempt jobs into non-exempt ones by refusing to perform their exempt job duties.)  As a result, certification would deprive Host of its right to defend against all of the claims that may be barred by unique defenses.

### D.   PLAINTIFFS CANNOT RELY ON PERFORMANCE OF CONCURRENT DUTIES TO ESTABLISH CLASS-WIDE EXEMPT STATUS.

Plaintiffs cannot salvage their attempt to certify the class of ASMs by arguing that many of them performed non-exempt duties for a majority of their shifts.  Even if true, "[i]n the restaurant and retail settings" the actual time spent on managerial tasks as opposed to non-exempt tasks is immaterial.  69 Fed. Reg. 22136-37 (April 23, 2004).  When the Department of Labor promulgated the "Concurrent Duties" Section of the exemption regulations, it specifically recognized that "[n]umerous courts have determined that an employee can have a primary duty

---

why plaintiffs cannot meet this burden are described more fully in Host's motion for summary judgment on the issue of willfulness, which is being filed concurrently.

Eight of the opt-ins (Bridgette Wallace, Kathleen Suzanne Roldan-Stiegler, Daniel Duininck, Don Green, Alexander Cook, William Leather, Ransome McLeod, and Freddy Cabrera) are time-barred under either provision as they opted in more than three years after their last date of employment with Host. Another 58 opted in more than two but less than three years after leaving Host's employ, including three of the target opt-ins (Bonacasa, Valentin, and Vranek).   Bonacasa, however, repeatedly represented to Host that he performed exempt management work, eliminating any possibility for a three-year limitations period as a result of a willful misclassification. (Bonacasa Dep. 59, 71, 93, 119, 128, 143, 168, 171, 248.)

Thus, the plaintiffs are not similarly situated for purposes of the statute of limitations defense as they fall within three groups.  Further, if the court denies Host's alternative motion for summary judgment on the subject of willfulness, it will need to conduct a fact-intensive review, one opt-in at a time, as to the timeliness of the claims of 269 opt-ins entirely, or another 58 opt-ins for that portion of their time that exceeds two years.

of management while concurrently performing nonexempt duties." *Id.* (citing *Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir. 1982)).

Thus, ASMs who supervise associates may still "have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register." 29 C.F.R. 541.700(c). Indeed, "time" spent on any duty "is not the sole test" for determining a primary duty. 29 C.F.R. 541.700(b); *see Diaz v. Team Oney, Inc.*, 291 Fed. App'x 947 (11th Cir. 2008) (affirming fast-food assistant managers were exempt even if they spent the majority of their time on non-exempt duties); *Jones v. Virginia Oil Co.*, 2003 WL 21699882, at *4 (4th Cir. 2003) (assistant manager who spent 75 to 80 percent of her time performing non-exempt tasks held exempt because she "could simultaneously perform many of her management tasks"); *Murray v. Stuckey's, Inc.*, 939 F.2d 614, 617-20 (8th Cir. 1991) (holding store managers as exempt even where they spent up to 90 percent of their time on "routine non-management jobs such as pumping gas, mowing the grass, waiting on customers and stocking shelves"). So the opt-ins cannot rely on testimony that they performed non-exempt tasks throughout their work days to establish their primary duties as non-managerial. *See Dorvil*, slip op. at 7-8 (holding Host ASM to be exempt because his primary duty was management even though he only "spent 20-25 percent of his time performing managerial duties").

Instead, an abundance of evidence shows that the opt-ins were primarily managers even though many of them also performed non-exempt work such as occasionally running a cash register or a grill. The court, therefore, must examine each opt-in separately, weighing the relevant evidence, to determine if the opt-in had a primary duty of management despite performing concurrent non-exempt duties.

To illustrate, Ryan Jensen testified that he frequently performs hourly work. (Jensen Dep. 124.)  But Jensen also was charged with running the store, and in fact, as the manager in charge, he hires associates, makes discipline determinations, schedules servers, evaluates associates, and analyzes payroll reports to maximize store profits. (Jensen Dep. 52, 58, 102-103, 113-115). Michele Simpson, an ASM of eight stores at the Las Vegas airport, similarly testified that she spent 90 percent of her workday doing hourly work.  (Simpson Dep. 87.)  Simpson, however, also testified that she truthfully reported in her self-evaluations that she:

- conducted interviews of applicants (*Id.* at 82);
- managed employee attendance and time logs (*Id.* at 65);
- supervised 25 to 30 employees per shift (*Id.* at 82);
- encouraged associates and employed a reward system to incentive good work habits (*Id.* at 60);
- managed customer refunds and complaints (*Id.* at 82);
- managed inventory and product ordering (*Id.* at 50); and
- used tools for business planning purposes (*Id.* at 63).

In sum, Simpson is like many of the opt-ins whose job duties will require individualized examination to determine if their primary duty was management.  Rote testimony that they performed non-exempt tasks is not remotely sufficient to qualify any of the ASMs, much less the entire class of 269, as non-exempt.

### E.   PLAINTIFFS CANNOT SHOW ANY REASONABLE METHOD FOR DETERMINING DAMAGES ON A CLASS-WIDE BASIS.

As mentioned, plaintiffs have a burden to prove they are similarly situated under Section 216(b).  But the statute does not limit their burden to making that demonstration only as to liability.  Even if the opt-ins had the same job duties—which they do not—their underlying damages claims reveal vast dissimilarity, which courts have found to be sufficient to require decertification.  *See* Order on Mot. to Decertify, *In Re: Dollar Gen'l Corp., FLSA Litig.*, No.

7:02-cv-673 (N.D. Ala. Aug. 8, 2006) Doc. 707 (granting decertification where plaintiffs could not "establish that they and the opt-in Plaintiffs are similarly situated with respect to damages").

In this case, those plaintiffs who have testified claim to have worked a wide range of hours, and some of that testimony is refuted by their supervisors.  For instance, Ira Stone testified that he worked 55 to 56 hours per week (Stone Dep. 182:4-15), but his store manager declared that Stone "often worked 40 or fewer hours per week, leaving early whenever possible," sometimes "more than 90 minutes before the end of his shift."  (Rostran Dec. ¶ 21.)  Vickie Willingham testified that at least three weeks per month, she worked 80 hours *per week*. (Willingham Dep. 226.)  Rosa Lorusso testified to working 60 to 80 per week, (Lorusso Dep. at 78) while Rapp and Simpson each testified that they always worked more than 50 hours per week and in Rapp's case up to 60 hours.  (Rapp Dep. 36:1; Simpson Dep. 25.)  Rapp's General Manager was more precise noting that because Rapp scheduled his own hours, he averaged between 48 and 52 hours per week.  (Shetron Dec. ¶ 22.)  Lorusso's Store Manager estimated that Lorusso, who "frequently called off work" "never worked a 50-hour week."  (Dollar Dec. ¶ 20.)  All of this illustrates that plaintiffs cannot demonstrate a reasonable or workable method to determine how many hours per week each opt-in worked for the purposes of calculating damages.

Due process permits certifying a class only when damage calculations, properly tied to a class-wide liability theory, can be effortlessly made.  *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013); *Espenscheid*, 705 F.3d at 774.  Assuming *arguendo* there is no dispute regarding the hours worked of testifying opt-ins, there is no accurate method to calculate damages for non-testifying opt-ins.  A presumption of a 40-hour week would deny the opt-ins any right they might have to overtime; just as a presumption of a 50, 60, 70, or 80-hour week

37

would deny Host its due process right to cross-examine them. Likewise, an average work week calculated based on deponents' testimony would undercompensate opt-ins who worked above the average while overcompensating those who worked below the average.  Such procedures obviously fly in the face of due process and are not permitted in aggregate litigation. *See Dukes*, 131 S. Ct. at 2560.  But the class plaintiffs are attempting to certify presents no alternative options to calculating individual damages, demanding that the class be decertified.

## IV.    <u>CONCLUSION</u>

Plaintiffs' class is not suitable for collective adjudication.  The ASMs are not in any fashion similarly situated so as to permit class-wide determinations to be as to liability and damages.  This wide variance among the disparate class members is a clear signal that certification should not proceed, and the motion for decertification should be granted.

Respectfully submitted,

*/s/ Gregory V. Mersol*

Gregory V. Mersol
**BAKER & HOSTETLER LLP**
3200 PNC Center
1900 East Ninth Street
Cleveland, OH  44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
gmersol@bakerlaw.com

Patrick M. Muldowney
E-mail:  pmuldowney@bakerlaw.com
**BAKER & HOSTETLER LLP**
200 South Orange Avenue
SunTrust Center, Suite 2300
P.O. Box 112

Orlando, FL  32802-0112
Phone: (407) 649-4000
Fax: (407) 841-0168

Margaret Rosenthal
**BAKER & HOSTETLER LLP**
12100 Wilshire Boulevard, 15th Floor
Los Angeles, CA 90025-7120
Telephone: (310) 820-8800
Facsimile: (310) 820-8859
mrosenthal@bakerlaw.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 7, 2014, a true and correct copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*/s/ Gregory V. Mersol*

One of the Attorneys for Defendants