UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
EASTON STEVENS, et al.,

        Plaintiffs,                     MEMORANDUM AND ORDER

   - against -                     10 CV 3571 (ILG) (VVP)

HMSHOST CORPORATION, et al.,

        Defendants.
---------------------------------------------------------x
GLASSER, United States District Judge:

Plaintiff Easton Stevens brings this collective action under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq., (the "FLSA"), against defendants HMSHost Corporation, Host International, Inc., and Host Services of New York (collectively, "defendants"). Plaintiff alleges that defendants failed to pay overtime wages to Assistant Managers ("AMs") because it misclassified AMs as managerial employees who are exempt from the FLSA's overtime requirements. An opt-in class of AMs was conditionally certified on June 15, 2012. Currently before the Court are defendants' motion to decertify the collective action, plaintiffs' motion for final certification, and plaintiffs' and defendants' motions for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, defendants' motion to decertify the collective action is GRANTED, plaintiffs' motion for final certification is DENIED, and accordingly the Court need not address the parties' motions for summary judgment at this time.

## BACKGROUND

### I.  Facts

1

Unless otherwise noted, the following facts are undisputed. Defendants manage and operate food and beverage concessions at numerous airports, highway travel facilities, and shopping malls across the United States. Defs.' Ex. A ("Lauterbach Decl.") ¶ 4. Their locations include a wide variety of restaurants, ranging from "grab and go" food outlets, to fast food venues, casual sit-down restaurants, bars, wine bars, brew pubs, and fine dining establishments. Id. ¶ 6. Defendants operate these restaurants both under their own name and under other brand names, including Burger King, Starbucks, Chili's, Quizno's, California Pizza Kitchen, KFC, and Pizza Hut. Id. ¶ 5.

Defendants' business is divided into units called "regions," which do not necessarily correspond to geographic regions. Id. ¶ 10. Each region is managed by a Senior Vice President. Id. ¶ 11. General Managers, who oversee specific locations—often more than one—report to Senior Vice Presidents. Id. ¶ 12. General Managers in turn supervise Store Managers. Id. ¶ 14. Depending on its size, a location may have more than one Store Manager. Id. ¶ 13. Store Managers are in charge of day-to-day operations at a particular location, and supervise AMs and hourly employees. See id. ¶¶ 14, 18. AMs are defendants' lowest-level exempt employees. Pls.' Ex. B at 87.

According to defendants, AMs are responsible for supervising Shift Supervisors and other hourly employees. Lauterbach Decl. ¶¶ 15, 18; Pls.' Ex. B at 35. Indeed, the official job description for the AM position[1] provides that an AM

- Supervises the day-to-day activities of Shift Supervisors and other non-management associates
- Assigns work responsibilities, prepares schedules, and ensures that all shifts are covered
- Prepares daily orders, ensures units are stocked with appropriate levels of product and coaches Shift Supervisors on order procedures

---

[1] There are three sub-levels of AMs, which have different minimum experience requirements, but the "Essential Functions" are identical in each of the job descriptions. Defs.' Ex. O.

2

- Conducts and coordinates on-the-job training for associates, and ensures all associates receive basic skills training to perform their jobs
- Resolves routine questions and problems and refers more complex issues to higher levels
- Provides recommendations for hiring, firing, advancement, promotion or any other status change of associates within the store

Defs.' Ex. O. Defendants state that although these job functions are for the most part consistent for all AMs, an AM's precise day-to-day duties could vary significantly due to the vast differences between locations. Lauterbach Decl. ¶¶ 21, 24–25.

Although the job description focuses on their managerial duties, it is undisputed that AMs are also required to perform non-exempt, non-managerial work. Indeed, all of the deposed plaintiffs testified that, at least some of the time, they performed the same type of work as defendants' hourly employees. See generally Dkt. No. 151 at 8–9 (collecting deposition citations). The deposed plaintiffs generally testified that they spent the majority of their time performing non-exempt work, but the split between exempt and non-exempt work varied among the plaintiffs, ranging from 95% non-exempt hourly work at the high end, Pls.' Ex. G at 202, to 70% at the low end, Pls.' Ex. N at 124. See also Dkt. No. 151 at 10 n.14 (collecting deposition citations).

At the same time, most of the deposed plaintiffs testified that they performed at least some exempt managerial work. See, e.g., Dkt. No. 145-38 (collecting deposition citations). For example, several of the deposed plaintiffs were involved in the interviewing and hiring process. Defs.' Ex. M at 85; Defs.' Ex. O at 106–07, 113; Defs.' Ex. U at 28–29; Defs.' Ex. V at 97; Defs.' Ex. Z at 54, 145; Defs.' Ex. CC at 53 (interviewing); Defs.' Ex. U at 58–59; Defs.' Ex. Z at 55 (hiring). Several more had authority to discipline and evaluate hourly employees, albeit to different degrees. Defs.' Ex. M at 65; Defs.' Ex. O at 123 (discipline); Defs.' Ex. U at 102–03; Defs.' Ex. X at 57;

3

Defs.' Ex. CC at 80 (evaluation).  And many of them were responsible for scheduling the shifts of hourly employees.  Defs.' Ex. O at 137–38; Defs.' Ex. U at 55, 58; see also Defs.' Ex. Z at 61–62 (subject to approval); Defs.' Ex. BB at 44–45 (same).  Only a few of the opt-ins testified to performing no managerial work, or only a de minimus amount.  Defs.' Ex. R; Defs.' Ex. S; Defs.' Ex. W.

Defendants were aware that AMs were performing non-exempt work.  For example, a slide show used during a corporate presentation to human resources managers about FLSA compliance noted that "Lots of our AMs are running food, running registers, and usually have a rag in their hand!!!"  Pls.' Ex. DD.  And defendants' Vice President of Compensation, Coleman Lauterbach ("Lauterbach") testified that he had heard that AMs were "performing duties such as using rags and mops and cleaning units and cleaning food," Pls.' Ex. A at 59, and that defendants were generally aware that AMs were "cleaning and cooking and serving food and drinks and serving customers, Defs.' Ex. B at 95–96.

## II.     Procedural History

Plaintiff commenced this action on August 2, 2010 by filing a complaint in this Court.  Dkt. No. 1.  On June 10, 2011, plaintiff moved to conditionally certify a class pursuant to 29 U.S.C. § 216(b).  Dkt. No. 36.  This Court referred the matter to Magistrate Pohorelsky to render a decision, Dkt. No. 45, and he entered an order conditionally certifying the class on June 15, 2012, Dkt. No. 49.  Defendants appealed that decision, Dkt. No. 51, but their appeal was denied by order dated October 10, 2012, Dkt. No. 56.  After the class was conditionally certified, 275 plaintiffs opted in to the

4

class, and 19 were deposed in the course of discovery.[2]  Dkt. No. 143 at 7 n.6.  Following the close of discovery, defendants moved to decertify the collective action on April 7, 2014.  Dkt. No. 143.  The next day, plaintiff moved for final certification of the collective action.  Dkt. No. 151.  Plaintiff and defendants filed their oppositions on May 7, 2010.  Dkt. Nos. 161, 164.

Contemporaneously with their motions regarding class certification, the parties each also moved for partial summary judgment on discrete issues.  Defendants filed their motion for summary judgment on April 7, 2010, Dkt. No. 147, and plaintiff on April 8, 2010, Dkt. No. 153.  Both plaintiff and defendants filed their oppositions on May 7, 2014.  Dkt. Nos. 160, 161.  The parties filed their replies on May 22, 2014.  Dkt. Nos. 169, 170.

## LEGAL STANDARDS

### I.      FLSA Exemptions

The FLSA generally requires all employers to pay employees overtime wages for all hours worked in excess of 40 hours per week, unless the employees fall into one of the statutory exemption categories.  29 U.S.C. § 207(a); Indergit v. Rite Aid Corp., 293 F.R.D. 632, 637 (S.D.N.Y. 2013).  Exempt employees include those who are "employed in a bona fide executive, administrative, or professional capacity . . . ."  29 U.S.C. § 213(a)(1).  The relevant Department of Labor regulations provide guidance as to the scope and applicability of these exemptions, but in all cases the exemptions should be construed narrowly, in accordance with the FLSA's remedial purposes.  See, e.g., Martin v. Malcolm Pirnie, Inc., 949 F.2d 611, 614 (2d Cir. 1991).

---

[2] The deponents included 14 plaintiffs that opted in following conditional certification, 4 plaintiffs that opted in prior to conditional certification, and the named plaintiff, Easton Stevens.

5

The "executive exemption" applies to an employee who (1) is "[c]ompensated on a salary basis of not less than $455 per week;" (2) "[w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;" (3) "customarily and regularly directs the work of two or more other employees;" and (4) has "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. §541.100(a). For purposes of the executive exemption, "management" includes, but is not limited to

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The "administrative exemption" applies to an employee who (1) is "[c]ompensated on a salary basis of not less than $455 per week;" (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

6

The applicability of each of these exemptions turns on the "primary duty" of the employee. See 29 C.F.R. § 541.700(a). To determine whether an employee's primary duty is exempt work, courts look to factors including "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." Id. The amount of time spent performing exempt work is not dispositive—"Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." Id. § 541.700(b). In addition, both the regulations and case law recognize that an employee may perform exempt work—such as supervising or directing the work of subordinates—concurrently with nonexempt work. See, e.g., id. § 541.106; Indergit, 293 F.R.D. at 641–42.

## II.   Collective Action

The FLSA provides that "one or more employees" may bring an action for violation of its minimum wage or overtime requirements "for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Unlike a class action under Rule 23 of the Federal Rules of Civil Procedure, employees must affirmatively opt in to an FLSA collective action. See id. FLSA collective actions generally proceed in two stages. Myers v. Hertz Corp., 624 F.3d 537, 554–55 (2d Cir. 2010). In the first stage, called conditional certification, the court addresses whether notice should be sent to "similarly situated" employees to provide them with the opportunity to join the action. Id. at 555. This stage requires only a "modest factual

7

showing" that the potential opt-in class "together were victims of a common policy or plan that violated the law." Id. At the second stage, the court must determine, "on a fuller record . . . whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs. The action may be 'de-certified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." Id. At the decertification stage, the burden is on the plaintiff to prove that the other employees are similarly situated. See, e.g., Indergit, 293 F.R.D. at 639.

Neither the text of the FLSA nor the relevant regulations provide further guidance as to what it means for employees to be "similarly situated." It is well-established that "similarly situated" does not require that plaintiffs' positions be "identical," Hendricks v. J.P. Morgan Chase Bank, N.A., 263 F.R.D. 78, 83 (D. Conn. 2009), but the Second Circuit has not yet articulated a precise standard for making such a determination. Courts in this Circuit have therefore employed an ad hoc, case-by-case approach, which looks to a variety of factors, including "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations that counsel for or against maintaining a collective action." Gardner v. W. Beef Props., Inc., No. 07-cv-2345, 2013 WL 1629299, at *4 (E.D.N.Y. Mar. 25, 2013) (collecting cases), adopted 2013 WL 1632657 (E.D.N.Y. Apr. 16, 2013).

The Court does not evaluate the merits of plaintiffs' claims at the decertification stage. Hendricks, 263 F.R.D. at 83; Gardner, 2013 WL 1629299, at *3. However, "understanding their claims . . . is essential to deciding whether Plaintiffs are similarly situated in relevant respects and allowed to proceed as a collective." Simmons v. Valspar Corp., No. 10-3026, 2013 WL 2147862, at *2 (D. Minn. May 16, 2013) (emphasis

8

in original). Similarly, the Court does not address the merits of defendants' defenses, but rather looks only to "whether the defenses asserted will be so individualized as to merit decertification." Cottle v. Falcon Holdings Mgmt., LLC, 892 F. Supp. 2d 1053, 1069 (N.D. Ind. 2012); accord Simmons, 2013 WL 2147862, at *2. Ultimately, "[t]he decision to certify or decertify a collective action under section 216(b) is soundly within the district court's discretion." Pendlebury v. Starbucks Coffee Co., 518 F. Supp. 2d 1345, 1348–49 (S.D. Fla. 2007); see also Gardner, 2013 WL 1629299, at *4 ("The decertification process . . . appears to be largely in the Court's discretion.") (quotation omitted).

## DISCUSSION

### I. Decertification

#### a. Disparate Factual & Employment Settings

Defendants argue that the plaintiff AMs had widely varying employment settings due to vast differences in location, size, brand, and type of restaurant. In addition, they argue that the deposed plaintiffs' testimony evidences a wide disparity in both the amount of exempt work plaintiffs performed and the amount of authority and discretion plaintiffs were allowed to exercise. Plaintiffs argue that any differences in employment setting are immaterial, because all of the plaintiffs primarily performed non-exempt work, had limited managerial authority, and were subject to uniform corporate policies and a blanket exempt classification.

Defendants' blanket classification decision and uniform corporate policies do not on their own render plaintiffs similarly situated. Although it can be evidence of similarity, it is well established "that blanket classification decisions do not automatically qualify the affected employees as similarly situated, nor eliminate the

need to make a factual determination as to whether class members are actually performing similar duties." Gardner, 2013 WL 1629299, at *7 (collecting cases) (quotation omitted). Neither is it dispositive that plaintiffs were subject to uniform corporate policies and received uniform training. Although the policies in question prescribe how to perform discrete tasks such as ringing a cash register, lifting heavy items, and serving food, they do not dictate the particular job duties of each AM. And plaintiffs do not explain how the uniform training AMs receive relates to their performing non-exempt work, rather than their managerial duties.

At the same time, the Court is not persuaded by defendants' argument that variations in location, size, and type of restaurant by themselves preclude a finding that plaintiffs are similarly situated. The argument does have an inherent appeal, because it seems intuitive that a quick service grab-and-go location in an airport, a roadside coffee shop, and a full-service, sit-down restaurant are very different employment settings, and that AMs will have different duties based on the number of subordinates at their location. But the record does not bear this out. Other than identifying deponents who supervised disparate numbers of hourly employees, defendants have not shown any examples of a correlation between a plaintiff's location and their job duties.

Ultimately, determining whether plaintiffs' employment settings were similar requires the Court to examine the deponents' testimony about their particular job duties and level of managerial authority. With respect to the various managerial job duties identified in the Department of Labor regulations, the variation and dissimilarity across the deponents' testimony is immediately apparent. For example, some of the deponents testified that they had scheduling authority. Defs.' Ex. O at 137–38; Defs.' Ex. U at 55, 58. Others stated that they could schedule shifts only with the approval of their Store

10

Manager or a Human Resources ("HR") employee. Defs.' Ex. Z at 61–62; Defs.' Ex. BB at 44–45. And still others testified that they had no such authority. Defs.' Ex. P at 43; Defs.' Ex. R at 48; Defs.' Ex. S at 67; Defs.' Ex. W at 56.

Similarly, some of the deponents testified that they could discipline hourly employees, Defs.' Ex. M at 65; Defs.' Ex. O at 123, while others could only do so with their Store Manager's or HR's approval, Defs.' Ex. U at 91–92, 98–101; Defs.' Ex. W at 59; Defs.' Ex. X at 104–05; Defs.' Ex. Y at 144; Defs.' Ex. Z at 66–71. And one of the deponents testified that she could not discipline subordinates. Defs.' Ex. S at 67.

The record also reveals a significant disparity with respect to hiring and firing authority. Several of the deposed plaintiffs testified that they played no role in the hiring and firing process. Defs.' Ex. R. at 47, 55–56; Defs.' Ex. S at 71; Defs.' Ex. X at 51, 64. But a number of others testified that they were involved in the hiring and firing process. Defs.' Ex. U at 58–59; Defs.' Ex. Z at 55. And others testified that they were occasionally involved. Defs.' Ex. W at 71; Defs.' Ex. P at 65; Defs.' Ex. CC at 53.

In addition, several of the deponents testified that they interviewed job candidates. Defs.' Ex. M at 85; Defs.' Ex. O at 106–07, 113; Defs.' Ex. U at 28–29; Defs.' Ex. V at 97–98; Defs.' Ex. Z at 54, 145; Defs.' Ex. CC at 53. But an equal number testified that they never did so. Defs.' Ex. P at 63; Defs.' Ex. R at 47; Defs.' Ex. S at 67; Defs.' Ex. W at 54; Defs.' Ex. X at 50–51; Defs.' Ex. Y at 45. Similarly, there was a roughly even split between deponents who evaluated hourly employees, Defs.' Ex. U at 102–03; Defs.' Ex. X at 57; Defs.' Ex. CC at 80, and those who testified that they did not, Defs.' Ex. Q at 97; Defs.' Ex. R at 49. And even among those who testified that they interviewed candidates or evaluated subordinates, there were differences as to the extent of their authority, the amount of discretion they could exercise, and the degree to

11

which their supervisors took their recommendations into account.  Compare Defs.' Ex. V at 97–98 (stating that he interviewed candidates using a set list of questions and then made recommendations to his supervisors), with Defs.' Ex. O at 106–07, 113 (stating that he interviewed candidates after his supervisors pre-screened them); compare Defs.' Ex. CC at 81 (stating that his supervisor determined whether hourly employees received raises based on his ratings), with Defs.' Ex. U at 103 (stating that his evaluation did not have any effect on the amount of an hourly employee's raise).

As the examples the Court has highlighted demonstrate, the opt-in plaintiffs' testimony varies significantly with respect to the factors relevant to the FLSA exemptions.  These wide differences in employment settings and job duties "greatly complicate the use of representative proof either to prove the correctness of the executive classification or to rebut such a showing."  Johnson v. Big Lots Stores, Inc., 561 F. Supp. 2d 567, 582 (E.D. La. 2008).  Accordingly, the disparate factual and employment settings of the opt-in plaintiffs weigh against proceeding as a collective action.

### b. Individualized Defenses

Defendants next assert that their "numerous individualized defenses . . . preclude certification."  They first argue that a collective action will prejudice their defense of judicial estoppel against those opt-in plaintiffs who failed to disclose their FLSA claims in prior bankruptcy proceedings.  But the court in Indergit recently held that judicial estoppel is not the sort of individualized defense that requires decertification, because it affects only damages, not liability, and can be easily and quickly resolved without the need for individualized proof at trial: "whether an opt-in's claims were discharged due to the bankruptcy disclosures . . . would be subject to generalized proof, and the question

12

of judicial estoppel itself is one of law, that could be determined by the Court in one instance." Indergit, 293 F.R.D. at 649–50. The same is true of defendants' statute of limitations defenses. See, e.g., Scovil v. Fedex Ground Package Sys., Inc., 886 F. Supp. 2d 45, 58 (D. Me. 2012).

Defendants also argue that they intend to challenge the credibility of some of the plaintiffs, noting that several deponents indicated on their yearly self-evaluations that they regularly performed exempt, managerial work, but claimed that those statements were embellishments or lies when confronted with their evaluations during their depositions. See, e.g., Defs.' Ex. U at 19; Defs.' Ex. Y at 163; Defs.' Ex. Z at 146–47, 164; Defs.' Ex. AA at 43. But these types of attacks on credibility are simply not the sort of individualized defenses that would preclude a collective action. See, e.g., Pendlebury v. Starbucks Coffee Co., 518 F. Supp. 2d 1345, 1362–63 (S.D. Fla. 2007) ("These contradictions are matters of credibility for the factfinder, not individualized *defenses*.") (emphasis in original).

Finally, defendants argue that their defenses are individualized because plaintiffs had "widely dissimilar" levels of managerial authority and duties, and accordingly they cannot assert a class-wide exemption defense. Here, the individualized defenses prong of the analysis mirrors the disparate employment settings prong. As discussed above, the deposed plaintiffs' testimony displays a wide disparity with respect to plaintiffs' authority to hire, fire, evaluate, discipline, and schedule subordinates, as well as the number of employees each supervised. Accordingly, determining whether a plaintiff is subject to an FLSA exemption will require individualized, rather than representative, proof. As the court in Johnson so aptly put it, "[u]sing representative proof is problematic if for every instance in which an opt-in plaintiff reported that she hired

subordinates, there is an alternative response to the contrary." 561 F. Supp. 2d at 587; see also id. ("[Defendants] cannot be expected to come up with 'representative' proof when the plaintiffs cannot reasonably be said to be representative of each other."). Accordingly, defendants' individualized defenses weigh against proceeding as a collective action. See Green v. Harbor Freight Tools USA, Inc., 888 F. Supp. 2d 1088, 1104 (D. Kan. 2012) (decertifying class where "deposition testimony shows that it is not possible to develop common testimony from the Store Managers regarding their daily responsibilities and duties, or the weight given their recommendations regarding hiring, firing and discipline").

### c. Fairness & Procedural Considerations

The Supreme Court has stated that an FLSA collective action allows plaintiffs to take "advantage of lower individual costs to vindicate rights by the pooling of resources," and allows the judicial system to benefit by "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." Hoffmann-La Roche v. Sperling, 493 U.S. 165, 170 (1989). But "[w]here there appears to be substantial different employment experiences among the various opt-ins the procedural advantages of a collective action cannot be realized." Indergit, 293 F.R.D. at 650 (quotation omitted). This third prong of the similarly situated analysis is therefore guided by the Court's resolution of the first two.

As discussed above, plaintiffs' employment settings and job duties varied widely in material ways and defendants' exemption defenses are accordingly not amenable to generalized or representative proof. Proceeding as a collective action would therefore have one of two results—it would either prejudice defendants' ability to present their

14

defenses, or require mini-trials for each of the opt-in plaintiffs. For this and all of the foregoing reasons, the class must be decertified.

## II. Summary Judgment

Having determined that the opt-in class should be decertified, the Court need not address the parties' motions for summary judgment. The discrete issues raised—defendants' willfulness and the applicability of the administrative exemption—can be addressed at the appropriate time in each of the individual actions.

## CONCLUSION

For all of the foregoing reasons, defendants' motion to decertify the collective action is GRANTED. The claims of the opt-in plaintiffs are dismissed without prejudice to refiling.

SO ORDERED.

Dated:  Brooklyn, New York
        August 26, 2014

                                            /s/
                                    I. Leo Glasser
                                    Senior United States District Judge